Leroy **HAEGER**, et al., Plaintiffs,

v.

**GOODYEAR TIRE AND RUBBER CO.**, et al., Defendants.

No. CV–05–02046–PHX–ROS.

United States District Court,
D. Arizona.

Nov. 8, 2012.

---

183. *Harris*, 510 U.S. at 21, 114 S.Ct. 367.

184. *Pennsylvania State Police v. Suders*, 542 U.S. 129, 131, 124 S.Ct. 2342, 159 L.Ed.2d 204 (2004).

940

Blanca Quintero, Cozen O'Connor, San Diego, CA, David L. Kurtz, Kurtz Law Firm, Scottsdale, AZ, John James Egbert, Michael J. O'Connor, Jennings Strouss & Salmon PLC, James Michael Abernethy, Abernethy & Green PLC, Phoenix, AZ, for Plaintiffs.

George Ian Brandon, Sr., Kendall Kyle Wilson, Brian Michael McQuaid, Squire Sanders (US) LLP, Graeme Em Hancock, Fennemore Craig PC, Phoenix, AZ, George W. Rooney, Jr., Roetzel & Andress LPA, Jill G. Okun, Squire Sanders &

Dempsey LLP, Cleveland, OH, Walter M. Yoka, Yoka & Smith LLP, Los Angeles, CA, for Defendants.

## ORDER

ROSLYN O. SILVER, Chief Judge.

Litigation is not a game. It is the time-honored method of seeking the truth, finding the truth, and doing justice. When a corporation and its counsel refuse to produce directly relevant information an opposing party is entitled to receive, they have abandoned these basic principles in favor of their own interests.[1] The little voice in every attorney's conscience that murmurs *turn over all material information* was ignored.

Based on a review of the entire record, the Court concludes there is clear and convincing evidence that sanctions are required to be imposed against Mr. Hancock, Mr. Musnuff, and Goodyear. The Court is aware of the unfortunate professional consequences that may flow from this Order. Those consequences, however, are a direct result of repeated, deliberate decisions by Mr. Hancock, Mr. Musnuff, and Goodyear to delay the production of relevant information, make misleading and false in-court statements, and conceal relevant documents. Mr. Hancock, Mr. Musnuff, and Goodyear will surely be disappointed, but they cannot be surprised.

## FINDINGS OF FACT

### I. The Accident

In June 2003, Leroy and Donna Haeger, along with Barry and Suzanne Haeger (collectively "the Haegers"), were traveling in a motor home owned by Leroy and Donna. It was manufactured by Gulf Stream Coach ("Gulf Stream") on a chassis manufactured by Spartan Motors, Inc. ("Spartan"). The motor home had "G159" tires manufactured by Goodyear Tire and Rubber Company ("Goodyear"). While traveling on the highway, one of the motor home's front tires failed, followed immediately by the motor home leaving the road and tipping over.[2] The Haegers suffered serious injuries as a result. The motor home was insured by Farmers Insurance Company ("Farmers").

### II. Initial Proceedings

In 2005, the Haegers and Farmers sued Gulf Stream, Spartan, and Goodyear. The Haegers and Farmers alleged various product liability and negligence claims, including a claim that G159 tires were defective if used on motor homes. (Doc. 13). The Haegers were represented by David Kurtz. Goodyear was represented by Graeme Hancock of Fennemore Craig PC and Basil Musnuff of Roetzel & Andress in Akron, Ohio. Because Goodyear was being sued throughout the country based on alleged defects in the same G159 tire, it had appointed Mr. Musnuff as "national coordinating counsel" on all G159 cases. (Doc. 1014 at 93). In that role, Mr. Musnuff was responsible for reviewing discovery requests, coordinating the search for documents, and drafting responses. (Doc. 1014 at 124–25). Mr. Musnuff worked directly with Goodyear's in-house counsel Deborah Okey.[3]

---

**1.** *See Nix v. Whiteside*, 475 U.S. 157, 166, 106 S.Ct. 988, 89 L.Ed.2d 123 (1986) (lawyer's "duty is limited to legitimate, lawful conduct compatible with the very nature of a trial as a search for truth").

**2.** The cause of the accident was never definitively determined. Goodyear claimed the tire failed due to a previous impact which had severely damaged the tire and the accident was a result of driver error after that failure. The Haegers claimed there had been no impact, the tire failed because it was defective, and the accident was unavoidable.

**3.** There were other attorneys involved in representing Goodyear, but the parties agree these were the attorneys responsible for Goodyear's behavior during this case.

On December 15, 2005, Goodyear served its Initial Disclosure Statement. (Doc. 992–1 at 20). According to that statement, "Plaintiffs' allegations with regard to the subject tire [were] unclear." (Doc. 992–1 at 23). Based on the alleged uncertainty, Goodyear's disclosure statement contained no meaningful information. In fact, it appears Goodyear's disclosure statement largely referenced witnesses and documents previously provided to Goodyear by Plaintiffs. Mr. Kurtz was not satisfied with Goodyear's initial disclosure and he wrote to Mr. Hancock and asked that Goodyear "take a more reflective look at your disclosure statement and comply with both the spirit and intent of the rule." (Doc. 992–1 at 27). In particular, Mr. Kurtz asked Goodyear to provide more meaningful disclosures regarding individuals who might have relevant information regarding the tire. Mr. Kurtz also asked Goodyear to produce "[t]esting documentation regarding the G 159 tires." (Doc. 992–1 at 29). Goodyear did not supplement its initial disclosure in any relevant way.

### III. Plaintiffs' Responses to Interrogatories

On August 18, 2006, Plaintiffs responded to a set of interrogatories from Goodyear.[4] Goodyear's interrogatory number 5 asked for "each legal theory under which you believe Goodyear is liable." (Doc. 963–1 at 19). In response, Plaintiffs stated it had been inappropriate to market the G159 tire for use on motor homes. According to

Plaintiffs: "Prolonged heat causes degradation of the tire which, under appropriate circumstances, can lead to tire failure and tread separation even when the tire is properly inflated." (Doc. 963–1 at 20). Because the G159 was originally designed "for pick-up and delivery trucks," Plaintiffs claimed using the tire on motor homes meant it was "operating at maximum loads and at maximum speeds, producing *heat* and degradation to which the tire was not designed to endure, leading to its premature failure." (Doc. 963–1 at 20) (emphasis added). Accordingly, as of approximately August 18, 2006, Goodyear and its counsel knew Plaintiffs' liability theory and that heat would be a central issue in this case.[5]

### IV. First Discovery Dispute and Protective Order

In August 2006, the parties filed their first notice of a discovery dispute. (Doc. 49). That disagreement centered on the terms of a protective order. The parties could not agree on how material designated "confidential" should be handled and on whether the protective order should include a provision allowing Mr. Kurtz to "share" information with other counsel litigating G159 claims against Goodyear elsewhere in the country. (Doc. 49). On August 22, 2006, the Court held a scheduling conference and also addressed the pending disagreements.

At the conference, Plaintiffs were represented by David Kurtz and Goodyear was represented by Mr. Hancock. When

---

**4.** There was a significant delay early in the case while the parties briefed, and the Court decided, whether to transfer the case to New Mexico. (Doc. 40).

**5.** In an email from Mr. Hancock to Mr. Musnuff dated October 18, 2006, Mr. Hancock explained Plaintiffs' theories in some detail. (Plaintiffs' Statement of Fact in Support of Supplemental Brief ("PSOF") Ex. 4). And in

an email from Mr. Musnuff to Ms. Okey dated November 9, 2006, Mr. Musnuff discussed the "new theory of liability in *Haeger*." (PSOF Ex. 5). Therefore, the repeated representations by Goodyear and its counsel that Plaintiffs did not state the legal theory of their case until January 7, 2007 is incorrect, contradicted by their own statements, and now appears to have been part of a general strategy to obstruct and delay discovery. (Doc. 983 at 4).

asked to explain the parties' disputes, Mr. Kurtz began by stating he was concerned Goodyear would abuse the provision allowing for documents to be designated "confidential." In effect, Mr. Kurtz wanted the protective order to contain a provision that would allow Goodyear's counsel located elsewhere to designate documents as "confidential." Local counsel, however, would be required to make "a reasonable inquiry to verify that in fact those confidentiality designations have been thoughtfully made by appropriate people." (Doc. 53 at 8). The Court rejected Mr. Kurtz's request and stated local counsel would not have to personally verify all "confidential" designations. But the Court also observed that local counsel remained "responsible for anything that's filed in this court ... [and] they have a good-faith obligation to the Court and they are officers of the Court." (Doc. 53 at 8).

As for the sharing provision, Plaintiffs argued it was necessary to ensure that all parties litigating cases against Goodyear would receive "the appropriate and complete data in similarly situated cases." (Doc. 53 at 10). The Court rejected this request, emphasizing that "every officer before this Court has an obligation to provide all relevant discovery." (Doc. 53 at 10). The Court observed that the Federal Rules already provide "that anything that is relevant must be turned over to counsel and to all the parties," so there was no need for the sharing provision. Therefore, as of August 2006 all counsel were expressly aware of the Court's expectations regarding discovery. The Court signed the scheduling order and the parties began discovery in earnest.

## V. Plaintiffs' First Request for Production of Documents

In September 2006, Plaintiffs served Goodyear with their First Request for Production of Documents ("First Request"). (Doc. 59). Approximately thirty days later, Goodyear provided its responses. As later explained by Mr. Musnuff, in preparing discovery responses Mr. Musnuff would draft the responses, send them to Ms. Okey for approval, and after Ms. Okey approved them, they would be sent to local counsel for filing and service. (Doc. 1014 at 65–66). While Mr. Musnuff was tasked with drafting responses, Ms. Okey was always the final decision maker regarding discovery responses. (Doc. 1014 at 67).

The initial responses drafted by Mr. Musnuff, approved by Ms. Okey, and signed by local counsel consisted of sixteen "general objections" and then specific objections to each request which largely referenced the general objections. (Doc. 938–1 at 19). For example, Plaintiffs' Request for Production No. 14 sought: "All test records for the G159 tires, including, but no[t] limited to, road tests, wheel tests, high speed testing, and durability testing." (Doc. 938–1 at 24). Goodyear's response was:

> RESPONSE: See General Objections. Goodyear objects to this Request for the reasons and on the grounds that it is Overly Broad, Unduly Burdensome and seeks Irrelevant and Confidential Information, seeks information about tires Not Substantially Similar, and Plaintiffs have identified No Defect Theory.

The record does not reflect any communications between Plaintiffs and Goodyear until Goodyear provided supplemental responses on November 1, 2006. (Doc. 62, 63). Most relevant here is Goodyear's supplemental response to the same "Request for Production No. 14." The supplemental response was:

> RESPONSE: See General Objections. Goodyear objects to this Request for the reasons and on the grounds that it is Overly Broad, Unduly Burdensome and seeks Irrelevant and Confidential Infor-

mation, seeks information about tires Not Substantially Similar, and Plaintiffs have identified No Defect Theory. SUPPLEMENTAL RESPONSE: Subject to and without waiving the foregoing objections, and in a good faith spirit of cooperation, Goodyear will produce, subject to the Protective Order entered in this case, the DOT test data for the Subject Tire for the Subject Time Frame.

(Doc. 948–1 at 54).

The sequence of events following Goodyear's supplemental responses is intensely disputed. On December 5, 2006, Mr. Kurtz and Mr. Hancock spoke on the phone. That conversation was about the difficulties the parties were having regarding discovery. According to a memorandum to the file Mr. Hancock prepared, during the call:

> I explained to [Mr. Kurtz] that the 'testing' universe he had asked for was overly broad and included all kinds of tests done on component parts or on design criteria that had nothing to do with anything we had seen involving this case. I anticipate [Mr. Kurtz] will send us a revision that asks for testing that has to do with high speed.

(Doc. 1032–2 at 51). On the particular issue of Request for Production No. 14, the memorandum stated Mr. Kurtz "agreed to be more specific about what kinds of tests he was looking for." (Doc. 1032–2 at 53). Mr. Kurtz has submitted an affidavit disputing Mr. Hancock's interpretation of that phone call. According to Mr. Kurtz, he "never withdrew or otherwise narrowed the scope of [the] original discovery requests." (Doc. 992–1 at 40). Mr. Kurtz states he "had no phone conversation with Mr. Hancock in December" where he made such an agreement. In short, according to Mr. Kurtz: "Nothing like [the events described by Mr. Hancock] ever occurred." (Doc. 992–1 at 40). The Court

need not decide whose recollection of the December 5, 2006 phone call is accurate. Any question of whether there was an understanding evaporated after a letter from Mr. Kurtz to Mr. Hancock.

On December 20, 2006, Mr. Kurtz sent Mr. Hancock a letter. That letter was meant as "a follow up of our recent discussions regarding discovery disputes." (Doc. 1044–2 at 17). The letter is lengthy and goes through numerous discovery disputes the parties were having. Most relevant here is the portion of the letter devoted to Request for Production No. 14. The letter states:

> *Request for Production No. 14.* We asked for test records for the G159 275/70R 22.5, including road tests, wheel tests, high speed testing, and durability testing. You objected, suggesting the test records were overly broad and unduly burdensome. You have only produced the DOT test data showing the tires were tested at 30 mph. My interest is in finding the rest of the test data. If there is any, it is your obligation to disclose it.

(Doc. 1044–2 at 25).

After receiving this letter, Mr. Hancock wrote an email to Mr. Musnuff. That email opened by stating: "We should either respond to any portions of Kurtz' 12.20 letter or figure out that we have a fight on our hands on these points and prepare a counter argument." (PSOF Ex. 7). The email goes through the entirety of Mr. Kurtz' letter but contains a specific reference to the Request for Production No. 14 and asks for guidance from Mr. Musnuff:

> RTP 14. Test records for all testing on this size G159 tire. Again, was the only testing at 30 mph or less? What speed testing/fleet testing did Goodyear rely on? Can/should we supplement since his theory is that this tire can't operate

at 75 mph in the southwest for long periods? (PSOF Ex. 7). The record does not contain Mr. Musnuff's response to this email.

Based on this evidence, the December 5, 2006 phone call may have led to confusion on Mr. Hancock's part whether the Request for Production No. 14 remained in place. But Mr. Kurtz's December 20, 2006 letter cleared up any possible confusion. Upon receiving that letter, Mr. Hancock undoubtedly knew Plaintiffs' Request for Production No. 14 had not been withdrawn or narrowed. In particular, this is evidenced by Mr. Hancock's email to Mr. Musnuff stating Goodyear needed to "figure out if we have a fight on our hands." Mr. Hancock could not have simultaneously believed that Mr. Kurtz withdrew the request but also that Goodyear might have "a fight on [its] hands." Moreover, Mr. Hancock explicitly acknowledged that Mr. Kurtz continued to request "[t]est records for **all** testing." (Emphasis added). Mr. Hancock's email establishes Mr. Musnuff knew about Mr. Kurtz's letter and that Mr. Musnuff knew Plaintiffs' Request for Production No. 14 was still active.

For simplicity and clarity, as of December 20, 2006 Mr. Hancock and Mr. Musnuff *knew* there was an outstanding request for: "All test records for the G159 tires, including, but no (sic) limited to, road tests, wheel tests, high speed testing, and durability testing." Any suggestion by Mr. Hancock and Mr. Musnuff that Mr. Kurtz had withdrawn his First Request is belied by the evidence of what they knew in December 2006. In addition, the position later advanced by Goodyear that it was relieved of any further obligation to respond to the First Request because it had lodged objections cannot be taken seriously. Mr. Hancock's email establishes Goodyear's counsel did not believe Mr. Kurtz needed to seek relief from the Court to obtain any further information from Goodyear. And finally, as of January 2, 2007, the date of Mr. Hancock's email, Mr. Musnuff *knew* the theory of Plaintiffs' case, and *knew* the request for additional test data was outstanding, but he neglected to even begin a search for responsive documents.

## VI. Goodyear Discovers High Speed Testing

On January 5, 2007, Plaintiffs disclosed their expert witnesses. (Doc. 103). One of Plaintiffs' experts was David Osborne. Mr. Osborne's expert report identified the speed at which the tire was operated as a contributing factor to its failure. Mr. Hancock and Mr. Musnuff exchanged emails after reviewing Mr. Osborne's report. Mr. Musnuff wrote to Mr. Hancock:

Osborne appears to draw the conclusion that the subject tire was only tested at speeds up to 30 mph from the fact that the only test data we produced is the DOT test data. Of course, our discovery response was limited to DOT test data because plaintiff had not yet identified their defect theory at that time. Now that plaintiffs are pinpointing speed as an issue, perhaps we need to supplement our discovery responses to show the testing of this tire at various speeds. Thoughts?

(PSOF Ex. 8). Mr. Hancock responded: "Yes, we should produce the testing that shows this tire was capable of prolonged speed use and was built for the rated load and had a wide safety margin." (PSOF Ex. 8).

On January 11, 2007, Mr. Musnuff emailed Ms. Okey to give her a copy of Mr. Osborne's report. That email contained the same paragraph Mr. Musnuff sent to Mr. Hancock and concluded that "we should consider supplementing our discovery responses to show the testing of this tire at various higher speeds." (PSOF

Ex. 9). Therefore, as of January 11, 2007, Mr. Hancock, Mr. Musnuff, and Ms. Okey were aware Plaintiffs had "pinpoint[ed] speed as an issue" and that Goodyear needed to "consider supplementing" its prior discovery responses. The record does not contain any indication whether Mr. Hancock, Mr. Musnuff, or Ms. Okey had further conversations on this point. The record is clear, however, that no supplementation ever occurred.

Around this same time, Mr. Musnuff was working with Sherman Taylor, a Goodyear tire engineer, "to locate documents and test data regarding the G159 Tire."[6] (Doc. 984–1 at 9). Based on receipt of Mr. Osborne's opinion, Mr. Musnuff asked Mr. Taylor "to locate the test data that the Radial/Medium Truck Tire Development Group used to release the G159 Tire for use at highway speeds." (Doc. 984–1 at 10). Mr. Taylor was not able to find "electronic or paper copies of the actual W84 high speed test data Goodyear used to release the G159 Tire for production." (Doc. 984–1 at 10). But on January 24, 2007, Mr. Taylor located "electronic post-production W84 high speed test data ("High Speed Tests") on the G159 Tire." (Doc. 984–1 at 11). When he discovered that data, Mr. Taylor also "discovered L04 heat rise test results ("Heat Rise tests") for the G159 Tire in the same electronic database." (Doc. 984–1 at 11). Mr. Taylor had another "employee pull the test results data into text files, which [he] then printed." (Doc. 984–1 at 11). According to Mr. Taylor, "[w]ithin a day or two of printing the test data, I delivered a copy to Mr. Musnuff." (Doc. 984–1 at 11). Mr. Taylor's statement refers to both the High Speed tests and the Heat Rise tests. Thus, according to Mr. Taylor, no later than early February 2007, Mr. Musnuff had actual copies of the High Speed and Heat Rise tests, not merely some knowledge that the tests had been conducted.

On February 12, 2007, Mr. Musnuff emailed Mr. Hancock a memo with a summary of the High Speed tests attached. (PSOF Ex 12). According to the memo, "Goodyear did test the [G159] at speeds greater than the 30 mph standard" as reflected in the High Speed tests. (PSOF Ex. 12). Based on that testing, the "tire was capable of being rated as a 75 mph tire."[7] (PSOF Ex 12). That same day, Mr. Musnuff emailed Mr. Taylor and asked about the "list of High Speed Test Results" Mr. Taylor had given to him. Mr. Musnuff asked whether the ten "High Speed Test Results" Mr. Taylor had provided represented "ALL occasions on which the subject tire was subjected to [the] High Speed Test." (PSOF Ex. 15). Mr. Taylor responded there were "66 [High Speed] test[s] performed between 1996 & 2002." Mr. Musnuff then asked Mr. Taylor to gather that additional data because "if we disclose any of the [High Speed] testing—which is in our best interest—then we need to produce all of it." (PSOF Ex. 15).

---

**6.** It was only after receiving the expert report that Mr. Musnuff began looking for any test results. (Doc. 1014 at 86–87).

**7.** Interestingly, Mr. Musnuff notes that the G159 underwent a "significant design change" shortly before the "Haeger accident tire" was manufactured. That change "was a revision to the tread compound that allowed this tire to withstand the heat of high speed operation. The tire already was sufficient to be rated at 75 mph, but this revision would have improved its performance at high speed even more." (PSOF Ex. 12). Clearly, as of February 2007, Mr. Musnuff understood there was a relationship between a particular compound, the heat produced in high speed applications, and the G159's durability. Simply, Mr. Musnuff knew that the specific compound used in a tire relates to that tire's durability. Thus, his later attempted explanations that the Heat Rise test was merely a compounders' test with no bearing on durability is not believable.

On February 19, 2007, Mr. Hancock emailed Mr. Musnuff to discuss the "Schedule for Haeger." (PSOF Ex. 16). That email stated:

> We need to gather and produce documents re high speed testing as soon as reasonably practicable. No deadline, but we want to produce them promptly, given the accusation of no high speed testing in the January report that put that at issue in the case.

(PSOF Ex. 16). Therefore, no later than February 19, 2007, Mr. Hancock, Mr. Musnuff, and numerous Goodyear employees knew the High Speed tests needed to be produced. Even assuming Mr. Musnuff decided to wait for Mr. Taylor to search for and locate additional test results, there is no acceptable explanation, or one even offered, why Mr. Musnuff did not produce the results he had at that time. While the record establishes Mr. Musnuff and Mr. Hancock both believed the High Speed tests needed to be produced, there is no indication which discovery request Mr. Musnuff and Mr. Hancock believed the tests were responsive to. But given that Plaintiffs had not yet propounded their Third Request for Production of Documents, Mr. Musnuff and Mr. Hancock could not have believed the High Speed tests were responsive only to that later request. Finally, as of February 19, 2007, Mr. Hancock knew that Plaintiffs' expert was relying on the alleged lack of high speed testing.

## VII. Statements Made After Learning High Speed Tests Existed

On April 6, 2007, approximately two months after Mr. Hancock knew the High Speed tests existed, the Court held a status conference. (Doc. 146). During that conference, the Court inquired whether the parties were on schedule to complete discovery by the applicable deadline. Plaintiffs' counsel stated he was on schedule. The Court then asked Mr. Hancock for his opinion on whether all discovery could be completed on time.

> The Court: Let me ask defense counsel, is there any internal documentation that is available that has been requested that your client has—clients have not provided?
>
> Mr. Hancock: Your Honor, speaking on behalf of Goodyear, we have responded to all outstanding discovery and those responses have been outstanding for some time and, you know, if a document shows up, we'll of course produce it and supplement our answers but I think we're done or nearly done.
>
> The Court: And your client has provided certification as is required by the rule?
>
> Mr. Hancock: Correct.

(Doc. 146 at 12–13). These statements were false.

Mr. Hancock received notice of the existence of the High Speed tests on February 12, 2007 and sent an email on February 19, 2007 stating Goodyear "need[ed] to gather and produce" them "as soon as reasonably practicable." As of the April 6, 2007 status conference, the High Speed tests had not been disclosed, Mr. Hancock knew this, and his in-court statements at the April 6, 2007 were untruthful.

## VIII. Third Request for Production of Documents

On May 8, 2007, Plaintiffs served their Third Request for Production of Documents ("Third Request"). Three of Plaintiffs' requests are relevant here: numbers 3, 4, and 10. Requests 3 and 4 sought: "All documents which relate to any speed or endurance testing to determine that the subject tire was suitable for [65 or 75] mph highway purposes." And Request 10 sought: "All documents which relate to the approval by Goodyear of the [G159] for 75 mph, including, but not limited to, all test-

ing records relating to suitability of the subject tire for that speed." (Doc. 938–1 at 36). In an affidavit, Mr. Kurtz explained why he propounded the Third Request:

My Third Request for Production utilized alternative language in a request for test records, which followed the language utilized in Goodyear's expert disclosures, which were received in my office in mid-April 2007. Mr. Olsen, Goodyear's in-house expert, specifically expressed his opinion that the G159 tire was designed for general highway use and designed to be operated at continuous highway speeds of 75 mph.

(Doc. 992–1 at 40–41). The Third Request for Production was not intended "to relieve Goodyear of any obligation to properly respond to Plaintiffs' First Request for Production of Documents and Interrogatories" nor was it intended to release Goodyear from "its obligations to timely supplement discovery responses." (Doc. 992–1 at 41). Before Goodyear responded to the Third Request, the Court held a hearing on a separate discovery dispute.

At the discovery dispute hearing on May 17, 2007, the Court addressed a dispute involving Plaintiffs' attempts to obtain information from Gulf Stream and Spartan regarding other motor home accidents. During discussion of the dispute, Plaintiffs' counsel expressed his belief that this "tire was never tested above 30 miles an hour." (Doc. 201 at 48). Because of this statement, the Court asked a specific question of Goodyear's counsel and received an unequivocal response.

The Court: Mr. Hancock, are there any tests that are available to show when this tire was tested for speeds above 30 miles an hour?

Mr. Hancock: Yes, Your Honor.

The Court: And they have been produced?

Mr. Hancock: No, Your Honor. They have been requested from the plaintiffs in a Request for Production that arrived in my office I believe last week where the discovery response is due in mid-June. And they will be—I have requested them from my client and they will be produced at that time.

The Court: All right. So Mr. Kurtz—

Mr. Kurtz: Your Honor, if I may, we have, as have lawyers across the country, they have asked for these tests. My requests for these speed tests have been outstanding for well over a year and Mr. Hancock himself told me the reason they haven't been produced is because nobody can find them anywhere.

The Court: Well, he's found them. He apparently has found them so you're going to have what you want.

Mr. Kurtz: Well, I'll be looking forward to reading them but that won't change the issue, Your Honor. You know, I think—you know, this is discovery, Judge. We ought to be able to ask some questions and I'm pleased to provide the court with a detailed factual record about these. These are not things that I'm making up. They are not things that experts divined. They are tied to hard documents prepared by Goodyear.

The Court: It seems to me that the issue has been narrowed after our lengthy conversation to the tests that have been used or were engaged in by Goodyear for the purpose of establishing for their purposes and for consumers that these tires could be used for—based upon the weight and pressure that they have indicated that they were or that they could hold for traveling above 75 or at 75 miles an hour.

Mr. Hancock: At and below Your Honor, thank you.

The Court: At and below. At no more than 75 miles an hour.

(Doc. 201 at 48–49). After further discussion with counsel regarding the appropriate scope of discovery and depositions, the Court made sure Mr. Hancock understood his obligations.

The Court: Is there any question in your mind, Mr. Hancock, what I am going to allow in terms of discovery? And that is the deposition questions that I will allow?

Mr. Hancock: Your Honor, I believe the court is saying . . . my witnesses should be deposed about the [testing] done on this [specific] tire with respect to the speed in which it can be operated and what records they have, what records they don't have and what those records show?

The Court: That's exactly right.

Mr. Hancock: Thank you, Your Honor. (Doc. 201 at 51). Mr. Hancock's statements were misleading.

As evidenced by the early February 2007 email traffic, Mr. Hancock knew about the High Speed tests and knew the tests needed to be produced. This was three months prior to Plaintiffs' Third Request. Thus, Mr. Hancock's in-court statement that the High Speed tests had only recently been requested in May 2007 was misleading and an apparent attempt to obscure the fact that Goodyear had been withholding the tests for approximately four months.

On May 21, 2007, Goodyear deposed Plaintiff's expert, Mr. Osborne. As Mr. Hancock and Mr. Musnuff knew, Mr. Osborne had opined that "no high speed testing of the tire was done." (Doc. 983–1 at 5). As evidenced by their email traffic in early February 2007, Mr. Hancock and Mr. Musnuff both knew high speed testing existed, Plaintiffs' expert's report directly

implicated that testing, and the testing needed to be produced. Mr. Hancock and Mr. Musnuff decided to withhold the High Speed tests for at least three months, and proceed with Mr. Osborne's deposition, knowing that Mr. Osborne was operating under incorrect assumptions and an incomplete record. The only plausible interpretation of this behavior is that Mr. Hancock and Mr. Musnuff decided to delay production of the tests in hopes of gaining a tactical advantage.

Still prior to production of the High Speed tests, the parties filed a notice of yet another discovery dispute. (Doc. 225). That notice recounted a variety of disputes, including a dispute involving Plaintiffs' request that Goodyear provide a 30(b)(6) witness.[8] At the discovery dispute hearing, Plaintiffs began by explaining the main theory of their case:

Mr. Kurtz: And the tire can't carry the weight of the motor home at [freeway] speed. And it causes the tire to degrade and fail. And we believe—and we're in the middle of this in this case—that that is part of the reason that we saw all these motor home failures with the G159 tire, is that when they get up to freeway speed, they're just not put together to operate in that environment.

(Doc. 243 at 13).

The parties then discussed with the Court the 30(b)(6) issue. Plaintiffs' counsel described the proposed deposition topics as including "the design history of this tire" and "testing for speed and weight." (Doc. 243 at 21). The Court ruled that the 30(b)(6) deposition could occur. (Doc. 243 at 27). The Court also clarified with Goodyear's counsel that the witness would be speaking on behalf of Goodyear. (Doc. 243 at 29).

---

**8.** On May 11, 2007, Plaintiffs noticed a 30(b)(6) deposition of Goodyear. The subjects of that deposition were to include the

"history of testing of the subject tire for speed capacity and weight capacity during the years of its production." (Doc. 175 at 4).

On June 21, 2007, Goodyear responded to Plaintiffs' Third Request. The responses were provided to Ms. Okey for her explicit approval. (PSOF Ex. 19, 20). Goodyear's responses opened with the same or substantially similar boilerplate objections as those made in response to Plaintiffs' First Request. Goodyear then provided three identical responses to Plaintiffs' three requests for the "speed or endurance testing" Goodyear used to determine the G159 was suitable for use at 65 and 75 mph. That response was:

> Subject to and without waiving the following objections, and in a good faith spirit of cooperation, Goodyear states that it is producing, subject to the Protective Order entered into this case, copies of electronically-maintained high speed durability test results conducted on [G159] production tires since August 1996. After diligent search, to date Goodyear has not been able to locate additional paper records for the tests that are recorded electronically, and it is believed that those paper records have been discarded pursuant to the Company's document retention practices. Also, after diligent search, to date Goodyear has not been able to locate the paper records for the high-speed durability tests which it conducted on the [G159] tire prior to August 1996, which were not recorded electronically, and it is believed that those paper records have been discarded pursuant to the Company's document retention practices. Goodyear will supplement this Response to produce these paper records if they are subsequently located.

> Goodyear objects to this Request for the reasons and on the grounds that it is Overly Broad, Unduly Burdensome,

seeks Irrelevant and Confidential Information.

(Doc. 938–1 at 36).

## IX. Repeated Statements that Goodyear Withheld High Speed Tests

Around the same time Goodyear responded to Plaintiffs' Third Request, the Court ordered the parties to "confer and set dates for all remaining depositions and discovery." (Doc. 251). On June 26, 2007, Plaintiffs filed a document stating the parties had complied with the Court's Order by establishing dates to complete discovery. Because a status hearing was scheduled for the near future, Plaintiffs' filing also addressed various discovery problems they were still having with Goodyear. According to Plaintiffs, Goodyear's June 21, 2007 disclosures were the "first time" it had disclosed "evidence which relates to the inability of the subject tire to operate at freeway speeds." Plaintiffs stated they were still waiting for Goodyear to produce additional testing information and they requested the Court "inquire and determine whether additional testing data is in Goodyear's possession to assure that Goodyear's disclosures are complete." (Doc. 256 at 3).

On June 28, 2007, Plaintiffs submitted a status report.[9] In that report, Plaintiffs stated:

> [T]he speed tests ... were **finally produced last week** by Goodyear. They were originally requested in September of 200[6]. The documents had been in **Goodyear's possession since January 2007** but not disclosed until after Plaintiffs had disclosed their experts' opinions, including rebuttal opinions, and Plaintiffs' expert's deposition was taken.

(Doc. 260 at 2–3). A second status report from Plaintiffs submitted that same day

---

9. The docket does not reflect a status report from Goodyear.

referenced the High Speed tests and alleged: "All of the test data has been the subject of outstanding discovery requests since last September." (Doc. 262 at 2). These repeated statements reflect Plaintiffs' belief that their First Request remained in effect and that the High Speed tests were responsive to the First Request.

On August 9, 2007, the parties filed a joint statement regarding a request to modify the scheduling order. In that document, Plaintiffs stated they were still attempting "to gather information from Goodyear on the design and testing of this tire." (Doc. 301 at 5). In addition, Plaintiffs claimed "Goodyear did not produce any testing on the speed of the tire until June [21], 2007,[10] despite the fact such testing was requested in Plaintiffs' First Request to Produce on September 20, 2006." (Doc. 301 at 6). In response, Goodyear argued Plaintiffs were attempting to "distract[ ] the Court with a series of red herrings regarding as yet unpresented and inchoate discovery disputes." (Doc. 301 at 7). Goodyear did not provide any substantive response regarding its late disclosure of testing data nor did Goodyear explain that its disclosure of the test data was timely based on Mr. Kurtz withdrawing his First Request in a phone conversation with Mr. Hancock in December 2006. Instead, Goodyear argued the discovery deadline had passed and requested the Court limit the amount of remaining discovery. Without addressing the testing data issue, the Court imposed new discovery deadlines. (Doc. 311).

On September 10, 2007, the parties submitted another joint statement of discovery dispute.[11] (Doc. 319). Plaintiffs were seeking to brief the issue regarding the "proper scope of discovery." Plaintiffs also wished to present "information that Goodyear improperly withheld high-speed test data from the court." (Doc. 319 at 2). On the issue of test data, Goodyear responded: "Nothing suggests this Court has ever ordered production of any test data to it." (Doc. 319 at 5). Goodyear also claimed it had "produced all the high speed test data on this tire in its possession in a timely response to Plaintiff's Third Request for Production." This latter statement was misleading.

As of February 2007, Mr. Hancock and Mr. Musnuff knew the High Speed tests were responsive to Plaintiffs' First Request. The statement in the status report that the High Speed tests had been produced in a "timely response to Plaintiff's Third Request" was intended to mislead the Court into believing those tests had been requested *only* in the Third Request. That was plainly not true and contrary to Mr. Hancock and Mr. Musnuff's own knowledge as shown in their emails. Based in part on Goodyear's deception, the Court denied Plaintiffs' request to brief these issues and ordered the parties to comply with prior rulings regarding the appropriate scope of discovery. (Doc. 320).

## X. Deposition of Goodyear's 30(b)(6) Witness

On September 12, 2007, Plaintiffs deposed Richard Olsen. Mr. Olsen had been designated as Goodyear's 30(b)(6) witness. Mr. Olsen was asked about the "high speed" tests Goodyear performed on the tire prior to Goodyear determining it could be released as a tire able to perform at speeds up to 75 miles per hour. In particular, Mr. Olsen was given the four High

---

**10.** The document states June 24, 2007 but from other evidence in the record it appears Goodyear produced the testing on June 21, 2007.

**11.** That document was not signed by an attorney for Goodyear.

Speed tests which had been turned over to Plaintiffs in June 2007 and was asked whether they constituted the entire universe of such tests.

> Mr. O'Connor (Plaintiffs' Counsel): To the best of your knowledge, [were] only these four high-speed tests available to Goodyear prior to rating this tire as a 75 mile an hour tire[?]
>
> * * *
>
> Mr. Olsen: No.
>
> Mr. O'Connor: What other high-speed tests are available?
>
> Mr. Olsen: I think we talked at length this morning when we first started getting into the high-speed test data that I've spoken with the people who were involved in the release of this tire, and they've confirmed to me that high-speed tests were run in the development process of this tire before it was released to production. We just don't have any paperwork available for that.
>
> Mr. O'Connor: Okay. So there were tests run, but those have either been discarded or thrown away, and we don't have the results of those tests. Correct?
>
> Mr. Olsen: We don't have them here today, but the people making the decision at that time likely had them available to them at that time.
>
> Mr. O'Connor: Okay. So they had them available, apparently, in 1998 and have somehow discarded them since 1998. Is that what you're trying to tell me?
>
> Mr. Olsen: I'm just saying that they're not available today.
>
> Mr. O'Connor: Okay. So based on the record we have, we only know of four available high-speed tests that we can look at as to whether or not Goodyear could justify speed rating this tire at 75 miles an hour in June of 1998. Correct?
>
> Mr. Olsen: We have four available today to us.
>
> * * *

> Mr. O'Connor: **Okay. So there's any— any separate testing that would have been done on this car—on this particular tire, sir?**
>
> Mr. Olsen: **There's a number of different test procedures that are run in the development process of a new tire before it goes into production.**
>
> Mr. O'Connor: **Do we have any of those tests, sir?**
>
> Mr. Olsen: **I don't have them, no.**
>
> Mr. O'Connor: **Are they still available?**
>
> Mr. Olsen: **I don't believe so.**

(Doc. 938–1 at 40–45) (emphasis added).

Mr. Hancock then asked Mr. Olsen some questions based on a document previously examined during the deposition. That document described the High Speed tests produced by Goodyear:

> Mr. Hancock: Okay. The—earlier on, the plaintiffs' counsel asked you about an exhibit ... it is the test data for high-speed wheel tests performed on this tire. Do you have that?
>
> Mr. Olsen. Yes....
>
> Mr. Hancock: ... There are other numbered tests that are not on the exhibit. Is that correct? Do you recall the testimony the plaintiffs' counsel asked you about saying, "Well, we don't have tests, for example, 4 through 7," that sort of thing?
>
> Mr. Olsen: Yes, sir.
>
> Mr. Hancock: As far as you know, are all of the tests that were in the databases that were searched that were on the—this, the tire at issue in this case, this specification tire, in that database, in what you have there?
>
> Mr. Olsen: Yes. They're all included here.

(Doc. 938–1 at 40–47).

Based on Plaintiffs' dissatisfaction with Mr. Olsen's testimony, the parties submit-

ted another joint statement of discovery dispute. One of the disputes centered on Plaintiffs' belief that Mr. Olsen "was not sufficiently knowledgeable" on various topics. (Doc. 345 at 1). Plaintiffs also claimed that Goodyear had not produced "all high-speed testing on the G159 tire and has improperly redacted responsive G159 high speed test results." Goodyear claimed it had "produced all 'high speed testing' data more than three months ago." (Doc. 345 at 3). Goodyear also represented that it had not redacted any tests but it had "simply omitted tests with other tires not at issue in the case, which were *not* part of Plaintiffs' request for the high speed tests ('any speed or endurance testing to determine that the subject tire was suitable for 75 mph highway purposes')." (Doc. 345 at 3). The Court held a hearing on these disputes on October 19, 2007. (Doc. 361).

At that hearing, Mr. Hancock made a number of unequivocal statements. Mr. Hancock averred that "Goodyear has searched for and produced all of the high-speed testing in its possession concerning the tire that is at issue in this case." (Doc. 361 at 45). After the Court learned Mr. Olsen may not have been qualified to state that all high speed testing data had been produced, the Court ordered Mr. Hancock to "ask [Mr. Olsen] just to make sure that . . . that everything that relates to the high-speed testing of this tire has been produced." Mr. Hancock responded: "I will do that, Your Honor. I will supplement our record. I believe that to be the case. I have checked with my client and confirmed that that is the case."[12] (Doc. 361 at 46). Mr. Hancock then went on to "flesh out the record." He stated:

Goodyear's normal document retention policy means we don't have those rec-

ords anymore. These are not government-required tests. You don't keep them. . . . So there were tests done. Mr. Olsen can testify about those tests but **there are no documents for him to be questioned about other than the documents that have been produced** and we will supplement with direct confirmation of that.

(Doc. 361 at 47) (emphasis added). After a break, Mr. Hancock affirmed that Plaintiffs had asked for "documents which relate to any speed or endurance testing to determine that the subject tire was suitable for 65 miles per hour." (Doc. 361 at 53). Mr. Hancock affirmed yet again that Goodyear:

has searched for and produced all of the high-speed testing on this tire. The original discovery request, which is how we got here, were all documents which relate to any speed testing to determine that the tire was suitable for highway purposes. All of that has been produced.

(Doc. 361 at 58–59). Mr. Hancock continued: "The discovery request is what did you rely on and tell the public that this tire could go 75 miles an hour? All of that testing has been produced. This tire goes out for sale and we produced all of the testing on any tire that was the same as any of the tires for sale." (Doc. 361 at 63).

All of these statements by Mr. Hancock were seriously misleading. Mr. Hancock knew, as evidenced by his February 2007 email to Mr. Musnuff, that the high speed tests were responsive to Plaintiff's First Request and they needed to be produced. By repeatedly relying on the tests being responsive only to the Third Request, Mr. Hancock was misleading the Court into thinking that Goodyear had been timely in

---

**12.** The record does not reflect whether Mr. Hancock asked Mr. Olsen about the High Speed tests but the record is clear that Mr.

Hancock did not provide any additional test results after this discussion.

producing the tests. But more important-ly, Mr. Hancock repeatedly represented that there were *no other documents* be-yond those already produced. As Mr. Ol-sen would inadvertently reveal later, Good-year and its attorneys were concealing a wide variety of other testing documents.

## XI. Post–Discovery Activity

Discovery formally ended shortly after the October 2007 hearing and the parties began briefing dispositive motions. The dispositive motions involved a wide array of complicated issues which, for purposes of this Order, are irrelevant. While those motions were pending, Plaintiffs agreed to dismiss Gulf Stream. (Doc. 635). Eventu-ally, the Court issued a lengthy order de-nying Plaintiffs' motion for summary judg-ment and denying in part and granting in part Goodyear's motion for summary judg-ment. (Doc. 651). The Court also granted Spartan's motion for summary judgment, dismissing Spartan from the case. (Doc. 652). Plaintiffs and Goodyear then pre-pared for trial by inundating the Court with motions in limine and other pretrial filings. The Court devoted substantial time and effort to resolving those motions. (Doc. 842, resolving over thirty motions). On April 14, 2010, the first day of trial, Plaintiffs and Goodyear informed the Court they had reached a settlement. (Doc. 926). As a result, the case was closed.

## XII. Other G159 Cases

Having recounted the factual history of this case, the Court must very briefly out-line certain events which occurred in other cases also involving G159 tires.[13] There were three other G159 cases of particular relevance here. Those cases involved ac-tions by some combination of Mr. Hancock, Mr. Musnuff, and Goodyear. The three cases are *Woods v. Goodyear* in Alabama, *Schalmo v. Goodyear* in Florida, and *Bog-aert v. Goodyear* in Maricopa County Su-perior Court. This Court cannot and would not issue sanctions based on actions taken in these other cases. But given that they bear directly on issues presented in this case, it is appropriate to look to them in some detail. *See, e.g., Thibeault v. Square D Co.,* 960 F.2d 239, 246 (1st Cir. 1992) ("The totality of the circumstances [relevant to a request for sanctions] can include events which did not occur in the case proper but occurred in other cases and are, by their nature, relevant to the pending controversy."). In particular, these other cases are relevant when deter-mining the credibility and state of mind of individuals involved in the present case.

### A. *Woods v. Goodyear*

*Woods v. Goodyear* involved an accident with a Monaco Diplomat motor home and was filed in Alabama. (Doc. 938–1 at 84). Mr. Musnuff worked directly on the case in his role as national coordinating counsel. Sometime prior to July 2007, the *Woods*

---

**13.** Goodyear has been subject to a number of suits involving the G159 tire. According to a list provided by Plaintiffs, Goodyear was first sued regarding the G159 in 1999. (Doc. 938–1 at 83). Given this long history of litigation, it is surprising that Goodyear did not even begin to look for certain testing information until January 2007 when Mr. Musnuff made a request based on the *Haeger* case. Mr. Mus-nuff's internal correspondence hints, but does not establish, that he knew about other testing long before January 2007. In his January 11, 2007 email to Mr. Hancock, Mr. Musnuff states "perhaps we need to supplement our discovery responses to show the testing of this tire at various speeds." (PSOF Ex. 8). If Mr. Musnuff actually did not know any other tests existed, his email musing that "perhaps we need to supplement" is, to say the least, a strange way of phrasing the matter. But it is possible Mr. Musnuff's current claim that he first went looking for test data in January 2007 is true because Goodyear's obstructive discovery practices prior to 2006 were suc-cessful in keeping the additional testing con-cealed. (Doc. 1014 at 120).

plaintiffs served on Goodyear their "Fifth Request for Production of Documents." That request sought, among other things: "All other testing conducted by Goodyear . . . that was undertaken, at least in part, to determine the suitability of [G159] tires to be driven at 65 mph." (Doc. 992–1 at 100). Goodyear's "Responses and Objections to Plaintiffs' Fifth Request for Production of Documents" were very similar to the responses served in *Haeger*. Those responses started out with sixteen general objections and then individual objections incorporating the general objections. Upon receiving Goodyear's responses, plaintiffs' counsel in *Woods* sent a letter asking Goodyear to "reconsider" its objections. Goodyear did not and the parties presented the issue to the court.

In late August 2007, the judge handling the *Woods* case resolved the discovery dispute. The court began by noting the case had "been pending for over 3 years and [had] been marked by disagreements over production of documents on first one issue then another." The court said it was "disgusted with the whole thing" and ordered Goodyear "to produce to the Plaintiff every document requested regarding the [G159] tire." (Doc. 992–1 at 127).

After receiving this order, Mr. Musnuff sent an email to numerous individuals at Goodyear explaining the judge had required Goodyear to "fully and completely respond to the Requests for Production." (PSOF Ex. 23). Mr. Musnuff included a "plan of action for responding to each RFP" and a "list of documents that need to be assembled for production in order to comply with the court's ruling." (PSOF Ex. 23). As recounted by Mr. Musnuff,

the *Woods* plaintiffs' request number 7 sought:

> All other testing conducted by Goodyear of its [G159] tire that was undertaken, at least in part, to determine the suitability of such tires to be driven at 65 mph without an undue risk of tread or belt edge separations.

Mr. Musnuff included a comment regarding this request:

> We will need to produce documents regarding ALL types of testing of the [G159] tire. That is the unfortunate reality of the judge's decision. **We already have the high speed test data,** but we should go through the release checklist and identify all available testing data. We have already produced the W84 Test Protocol in other litigation. We have not previously produced the protocol set forth in the Master Specification, but we need to consider whether it serves our best interest to produce it.[14]

(PSOF Ex. 23, August 20, 2007 email) (emphasis added).

One week later, Goodyear employee Sherman Taylor responded by stating, "Below are the responses to [RFP] # 7." (PSOF Ex. 24). Mr. Taylor attached the following documents:

- DOT FMVSS–119 Extended Certification
- Heat Rise test;
- Bead durability test;
- Crown durability test;
- W16 test;
- W64 test;
- G09 test; and
- L04 test.

---

**14.** Stating "we need to consider whether it serves our best interest to produce" an otherwise responsive document reflects precisely Goodyear's attitude toward its discovery obligations. Rather than conveying a concern that all responsive documents be produced, Mr. Musnuff's statement conveys that Goodyear's primary interest was to produce only those documents which would be in Goodyear's "best interest."

That email was sent to Mr. Musnuff and Goodyear engineer Jim Stroble. There is no record that Mr. Stroble subsequently clarified that Mr. Taylor's email was wrong. And, presumably relying on Mr. Taylor's opinion, Mr. Musnuff later supervised the production of the Heat Rise tests and the other tests listed.

The following point is critical and must be emphasized. As of August 27, 2007, Mr. Taylor and Mr. Musnuff knew that *all* of the tests listed in Mr. Taylor's email were responsive to a request for those tests which Goodyear conducted "to determine the suitability of [the G159] to be driven at 65 mph." This is in direct conflict with the position Mr. Musnuff and Goodyear adopted in the present case. According to Mr. Musnuff and Goodyear, their position in the present case was based on a belief that *only* the High Speed tests were responsive to Plaintiffs' request for: "All documents which relate to any speed or endurance testing to determine that the subject tire was suitable for [65 or 75] mph highway purposes." Mr. Taylor's email shows Mr. Musnuff and Goodyear previously believed many other tests were responsive to such a request.

### B. *Schalmo v. Goodyear*

*Schalmo v. Goodyear* involved an accident with a Fleetwood motor home and was filed in Florida. (Doc. 938–1 at 84). Again, Mr. Musnuff worked directly on the case in his role as national coordinating counsel. During discovery, the *Schalmo* plaintiffs' sought "all documents reflecting studies, analysis or testing . . . associated with determining the appropriate speed rating, Load Range and/or vehicle application of the G159 tires." (Doc. 992–1 at 4).

In April 2008, Goodyear responded to this request with a list of over twenty-five tests. Included in those tests were the Heat Rise tests. (Doc. 992–1 at 5).

Just as in the *Woods* matter, Goodyear's discovery response in *Schalmo* was an affirmative statement that the Heat Rise tests were responsive to a request for the testing Goodyear had used to determine the "appropriate speed rating, Load Range, and/or vehicle application of the G159 tires." As with *Woods*, the position taken in *Schalmo* is inconsistent with that taken in the present case. Rather than merely concede the response in the current case was inaccurate, Mr. Musnuff and Goodyear now claim the response in *Schalmo* was inaccurate.[15]

According to Mr. Musnuff and Goodyear, when local counsel in *Schalmo* responded to the discovery request, he simply listed the same test data for each request for production, even though each of the tests listed was not responsive to each request.[16] As stated by Mr. Musnuff's current counsel, "the fact that the same lists were included with the responses to the first three discovery requests did not indicate that each listed test was responsive to each specific type of data requested." (Doc. 1000 at 3). Neither Goodyear nor Mr. Musnuff gives an acceptable explanation why, after being so precise in its discovery responses elsewhere, Goodyear suddenly decided to produce documents in this manner. Mr. Musnuff has attempted to explain that the *Schalmo* discovery response was complicated by Florida law and the need to submit certain documents for *in camera*

---

**15.** This position also means Goodyear's document production in *Woods* was wrong.

**16.** In fact, Mr. Musnuff goes further and states that some of the testing provided in *Schalmo* was not responsive to any of the requests. (Doc. 1000 at 9). It is strange and

troubling that Mr. Musnuff expresses no concern that in a litigation he was supervising, discovery responses were served which allegedly provided clearly misleading lists of documents, including totally non-responsive documents.

review prior to production. That explanation is senseless. Even assuming Florida law requires extra procedures, there is no requirement in Florida law that litigants provide grossly inaccurate discovery responses.

A final point regarding *Schalmo* involves Mr. Musnuff's admission that the Heat Rise tests were a type of "durability test." On May 8, 2009, Mr. Musnuff emailed Goodyear engineer Jim Stroble to discuss the Heat Rise tests. That email states "plaintiffs in Schalmo are now trying to cite our Heat Rise Testing as evidence that the tire is defective for generating excessive temperatures." As recounted by Mr. Musnuff, the *Schalmo* plaintiffs were "highlight[ing] the Heat Rise testing **taken during the durability testing of the G159.**" (PSOF Ex. 34) (emphasis added). Thus, as of May 2009, Mr. Musnuff knew the Heat Rise tests were a type of durability testing and that plaintiffs suing Goodyear in a G159 motor home case believed the Heat Rise tests were of great significance.

### C. *Bogaert v. Goodyear*

*Bogaert v. Goodyear* involved an accident with a Fleetwood motor home and was filed in Maricopa County Superior Court in 2005. (Doc. 938–1 at 84). Goodyear was represented by Mr. Hancock as local counsel and Mr. Musnuff served as national coordinating counsel. As with all the other Goodyear cases which have been brought to the Court's attention, the *Bogaert* matter involved extreme difficulty in convincing Goodyear to produce documents. In early 2008, dissatisfied with Goodyear's discovery responses, the *Bogaert* plaintiffs filed a motion to compel. (Doc. 992–1 at 49). On March 20, 2008, the discovery special master ordered Goodyear to "produce the requested documents." (Doc. 992–1 at 66). In particular, Good-

year was ordered to produce the "testing conducted by Goodyear of its [G159] tires that was undertaken, at least in part, to determine the suitability of such tires to be driven at 65 mph without an undue risk of tread or belt edge separations." (Doc. 992–1 at 70). This was *identical* to the discovery request in *Woods* that led Mr. Taylor to list as responsive the various tests, including the Heat Rise tests.

On June 5, 2008, Mr. Musnuff emailed Mr. Hancock regarding the *Bogaert* case. That email stated, in relevant part:

In meeting with [Goodyear Engineer] Jim Stroble yesterday, we came to conclude that we might be best served by producing data from additional tests of the Subject Tire.[17] As you know, we have produced the available electronically maintained high-speed test data in this case (and in Haeger and Haley [another G159 case] as well) along with the current protocol.

One of the 30(b)(6) topics relates to testing done to make sure the tire was suitable for RV usage. There was no testing specifically done on RVs, **but our whole testing package was to ensure that the tire was suitable for over-the-road applications, including RV.**

In the Woods case, we were compelled to produce other testing data/protocols in addition to High Speed. There, we produced **(i) extended DOT testing data, (ii) heat-rise test data, (iii) bead durability (aka Runflat) test data, and (iv) crown durability test data,** along with the current (evergreen) protocol for each of those tests. . . .

Jim thinks that it may be helpful to produce these documents so that he can review them in preparation for his deposition. That seems ok with me. Do you agree? Thoughts?

---

**17.** As with his email in the *Woods* case, Mr. Musnuff was concerned with what would

"best serve[ ]" Goodyear's interests rather than producing responsive documents.

(PSOF Ex. 31) (emphasis added). The first bolded portion above is a statement by Mr. Musnuff that as of June 5, 2008, he believed Goodyear's "whole testing package" was done to ensure the G 159 was "suitable for over-the-road applications, including RV." That testing package included the Heat Rise tests. And the second bolded portion shows Mr. Hancock knew as of June 5, 2008 that "extended DOT testing data," "heat-rise test data," "bead durability ... test data," and "crown durability test data" existed and it had been produced in another G159 case. Mr. Hancock responded to the email with "Let's discuss." Three months later, Mr. Hancock asked "Basil—Did you come to a conclusion on this?" And one month after that, Mr. Hancock said "Need to discuss this." The Heat Rise tests were never produced in *Bogaert*.

The history of *Bogaert* establishes three critical facts. First, *Bogaert* was filed in Arizona state court in 2005. Under Arizona Rule of Civil Procedure 26.1, Goodyear had affirmative disclosure obligations. Mr. Hancock claims to have explained these affirmative disclosure obligations to Mr. Musnuff but Mr. Musnuff now claims that prior to early 2007, he "was unaware of any test records relating to the G159 tire other than the DOT test data" Goodyear produced in every case. (Doc. 983–1 at 6). Mr. Musnuff stated under oath that he only started looking for test results in January 2007. Thus, the present record is clear that either Mr. Hancock did not explain Rule 26.1 or Mr. Musnuff and Goodyear chose to ignore it. Either way, Goodyear and its attorneys clearly had no interest in complying with their discovery obligations unless those obligations were in the "best interest[s]" of Goodyear. (PSOF Ex. 23, August 20, 2007 email) (emphasis added).

The second fact that the *Bogaert* record establishes is that long after its responses were served in the present case, Mr. Musnuff believed Goodyear's "whole testing package" was to ensure the suitability of the G159 for "over-the-road applications." That testing package included the Heat Rise tests, the extended DOT test, crown durability test, and the bead durability test. Therefore, prior to the present sanctions proceedings, Mr. Musnuff was of the opinion that *all* of these tests were responsive to a request for the data Goodyear used to determine the G159's suitability for use "over-the-road." In other words, in June 2008 Mr. Musnuff was of the opinion that the Heat Rise tests, extended DOT test, the bead durability test, and the crown durability test were responsive to Plaintiffs' Third Request.

And the third fact established by the *Bogaert* record is that no later than June 5, 2008 Mr. Hancock knew of the existence of additional test data not produced in the present case. While there is no evidence that Mr. Hancock actually had copies of the underlying test results referenced in Mr. Musnuff's email, he knew that the tests existed and he either knew or should have known that the disclosures in the present case had been woefully inadequate.

Viewed together, Goodyear and its counsel took positions in the other G159 cases directly contrary to the positions they now ask this Court to accept. The positions taken in these other cases, when Goodyear and its counsel were not attempting to avoid sanctions, are reliable. As explained below, this means Goodyear, Mr. Hancock, and Mr. Musnuff knowingly concealed crucial documents in the present litigation.

## XIII. Plaintiffs' Counsel Writes to Goodyear About Undisclosed Tests

Close to one year after the present case settled, Mr. Kurtz wrote to Mr. Musnuff

and stated he had "great concern regarding the adequacy and honesty of the disclosures made" in this case. (Doc. 938–1 at 49). This concern was based on a newspaper article regarding *Schalmo*. That case had proceeded to trial and resulted in a 5.6 million dollar award against Goodyear. (Doc. 938–1 at 12). According to the newspaper article, during trial the *Schalmo* plaintiffs had presented "Goodyear documents including internal heat and speed testing and failure rate data." (Doc. 938–1 at 12). Mr. Kurtz observed that no such data was produced in this case and he asked Mr. Musnuff whether such records actually exist. In response, Mr. Musnuff stated "Goodyear stands behind its discovery responses in the *Haeger* case, and we stand behind the properly-stated objections to the scope of the discovery requests propounded by the plaintiffs in this case." (Doc. 938–1 at 53). Mr. Kurtz then emailed Goodyear's counsel, asking for a direct answer whether "internal heat test records" existed. (Doc. 938–1 at 56). Mr. Musnuff responded that it would not be "productive to debate these issues further." (Doc. 938–1 at 56).

Mr. Kurtz sent a follow-up letter, which Mr. Musnuff responded to by claiming Mr. Kurtz' allegations were "unprofessional and without merit." (Doc. 938–1 at 66). Mr. Musnuff stated Goodyear had "abided by all of Judge Silver's rulings and we take issue with any suggestion that we were disrespectful or misled the court in any manner or that we failed to comply with any of her rulings in this case." Mr. Musnuff admitted "it is true there are testing records regarding the [G159] tire that were not produced in the *Haeger* litigation. *That fact was clear during the course of the litigation,* and certainly at the time plaintiffs chose to resolve this case."[18] (Doc. 938–1 at 66) (emphasis added). Mr. Musnuff then offered a disturbing explanation of what happened.

> Plaintiffs propounded a request that Goodyear produce all testing data related to the Subject Tire. However, that did not automatically create an obligation that Goodyear produce all testing data in this case. Goodyear responded to plaintiffs' request by objecting to the scope of the request on several good-faith grounds.... Goodyear did produce DOT testing data in response to plaintiffs' request, showing that the Subject Tire was in full compliance with FMVSS 119, but Goodyear objected to the production of any other testing data. We never represented that this DOT testing data comprised the totality of testing done with regarding to the Subject Tire, a fact which you have conceded.

Mr. Musnuff stressed that Goodyear's objections to the First Request did "not set or establish the appropriate scope of discovery. That is the province of the court." (Doc. 938–1 at 67). Because Plaintiffs never filed a motion to compel regarding "all testing data," Goodyear had no obligation to produce all such data.

Mr. Musnuff also explained that the High Speed tests eventually produced were in response to "additional requests for production" but Goodyear "never represented that this high speed endurance testing data comprised the totality of test-

---

18. There is no plausible way to read the record as supporting this contention. It certainly was *not* clear to the Court that Goodyear was withholding documents regarding the G159's performance in "highway" testing. Had it been "clear" to the Court what Goodyear and its counsel were doing, the Court would have immediately ordered disclosure and imposed sanctions for misconduct. To claim this Court would *knowingly* allow Goodyear to withhold relevant and discoverable information is outrageous. In addition, the claim by Goodyear's counsel that Plaintiff's allegations were "unprofessional and without merit" is preposterous. (Doc. 938–1 at 66).

ing done with regard to the Subject Tire." (Doc. 938–1 at 67). There was no mention in Mr. Musnuff's letter that Mr. Kurtz had withdrawn or narrowed his First Request.

## XIV. Plaintiffs File Their Motion for Sanctions

On May 31, 2011, Plaintiffs filed a motion for sanctions based on alleged "discovery fraud." (Doc. 938). Plaintiffs argued Goodyear had "knowingly concealed crucial 'internal heat test' records related to the defective design of the G159." (Doc. 938 at 1). Plaintiffs pointed to their First Request as evidence that they had sought "all test records for the G159 tires." (Doc. 938 at 5). Plaintiffs claimed they had been misled by Goodyear's tactic of objecting and answering the First Request. (Doc. 938 at 8). This led Plaintiffs to believe "that the responsive information [was] being disclosed and Goodyear [was] simply preserving objections." (Doc. 938 at 8).

Goodyear filed a lengthy response to the motion. (Doc. 948). That opposition began with an attempt to recount the history of discovery. As recited by Goodyear, Plaintiffs' First Request sought "all test records." (Doc. 948 at 3). Goodyear admitted it responded to this request by objecting and by providing the DOT test but argued it "never represented that the DOT test data comprised the totality of testing with regard to the G159 tire." (Doc. 948 at 3). Goodyear next explained that the High Speed tests it did produce were in response to the Third Request. (Doc. 948 at 3–4). According to Goodyear, the tests Plaintiffs were now referencing, i.e., the Heat Rise tests, did not qualify as "high speed testing" responsive to the Third Request and, therefore, were not produced. (Doc. 948 at 4). This last statement requires detailed scrutiny.

Plaintiffs' Third Request sought: "All documents which relate to any speed or endurance testing to determine that the

subject tire was suitable for [65 or 75] mph highway purposes." Goodyear's response to the motion for sanctions argued the Heat Rise tests were not responsive because they were "not high speed testing at all." (Doc. 948 at 4). As a preliminary matter, Goodyear's response is confusing given that the Third Request did not seek "high speed testing." It sought documents which related to *any* speed or endurance testing to determine the G159 was suitable for highway purposes; a test conducted at low speeds would be responsive to this request. Thus, Goodyear's claim that it did not need to produce the Heat Rise tests in response to the Third Request because the Heat Rise tests were not "high speed testing" was, in large part, a non-sequitur. But even more importantly, Goodyear's opposition to the sanctions motion did not argue the tests were non-responsive due to Goodyear's decision not to rely on them as proof the G159 was suitable for highway use. That is, Goodyear argued only that the "internal heat tests" were not "high speed testing;" it did not argue the tests were withheld because Goodyear had not relied on them to determine suitability for highway purposes. As set forth later, the failure to make this argument is telling.

Finally, Goodyear's opposition to the sanctions motion claimed its behavior during discovery had "unambiguously indicat[ed] that it would not produce *all* test data." (Doc. 948 at 4). The Court is at a loss to determine what Goodyear believed was an "unambiguous" indication that it was withholding certain tests performed on the G159 tire. Both Plaintiffs and the Court were unable to perceive this "unambiguous" indication and Goodyear's statement is incredibly inaccurate. Throughout the numerous discovery dispute filings and hearings, the Court was under the impression that Goodyear had produced *all* test data relevant to Plaintiffs'

claims.[19] In fact, at various points the Court became exasperated with Plaintiffs' apparently unsubstantiated claims that additional information must exist. Based on personal observation and discussions with Mr. Hancock during in-court hearings, the Court came to believe Mr. Hancock thoroughly understood his discovery obligations and that he was making every effort to comply with them. There simply was no reason for the Court to question Mr. Hancock's representations and Plaintiffs' repeated attempts to cast aspersions on Mr. Hancock appeared misguided. Of course, now that Goodyear has been forced to admit additional information does exist, that exasperation was misplaced. Suffice it to say, had there ever been an "unambiguous" indication that Goodyear was withholding certain test data, the Court would have immediately addressed it and taken appropriate action.

Before filing their reply, Plaintiffs asked the Court to order Goodyear to produce "the requested tests." (Doc. 949 at 2). Goodyear opposed that motion and argued it should not have to produce the "heat test" documents because "Goodyear has committed no discovery violation." (Doc. 951 at 4). On October 5, 2011, the Court concluded there were "serious questions regarding [Goodyear's] conduct in this case" and, based on the Court's power to conduct an independent investigation, ordered Goodyear to produce "the test results at issue." (Doc. 954 at 1). Goodyear produced the Heat Rise tests but kept numerous other tests concealed. After obtaining the Heat Rise tests, Plaintiffs filed their reply and explained the importance of the tests. (Doc. 963). Spartan subsequently joined the motion for sanctions, arguing it also suffered harm as a result of Goodyear's alleged misconduct. (Doc. 966).

## XV. Explanation of Undisclosed Test Results

The initial motion for sanctions centered on the Heat Rise tests. Those tests are titled "Laboratory Durability Testing—Heat Rise" and were conducted on four G159 tires on April 21, 1996. The tests were meant to "determine the dynamic heat build-up at specific loads, speeds, and inflations." (Doc. 963–1 at 7). The Heat Rise tests were conducted on a "67.23 [inch] diameter flywheel" and consisted of running the tires at 35 miles per hour and checking the temperature of the tire at certain intervals. (Doc. 963–1 at 7). The Heat Rise tests describe 35 miles per hour as reflecting "highway use." Even though 35 miles per hour seems substantially slower than highway speeds, the rationale for this description is explained by Goodyear's 30(b)(6) witness. Testing a tire on a 67–inch flywheel places "upwards of double the speed" impact on a tire as the tire impact of "a vehicle on a road surface." In other words, "if you run 45 miles an hour on the steel flywheel [that] is the equivalent temperaturewise of 70, 80 miles an hour on the public highway as far as the heat history goes." (Doc. 963–1 at 61). Under this logic, testing tires at 35 miles per hour on a flywheel would be the equivalent of 55–65 miles per hour on the highway.

According to the Heat Rise tests, after running at 35 miles per hour, the G159 tires generated temperatures of up to 229 degrees. The parties now dispute whether these temperatures were cause of concern. Plaintiffs have cited to Goodyear's internal documents, Goodyear's expert, and Goodyear's 30(b)(6) witness as stating this temperature was sufficiently high to be cause for concern. Goodyear counters that these temperatures were no more

---

**19.** According to the Court's calculations, the parties spent approximately sixteen hours in court on discovery matters. This is an extraordinary amount of time.

damning than other evidence already in Plaintiffs' possession. Whether Plaintiff or Goodyear is correct, it is clear that Plaintiffs believe the Heat Rise tests would have been helpful to their case. And regardless of the position now adopted by Goodyear and its counsel, there can be no serious dispute that the Heat Rise tests were relevant to Plaintiffs' claims.

## XVI. Court's Preliminary Order

On February 24, 2012, the Court issued "Proposed Findings of Fact and Conclusions of Law." (Doc. 970). After recounting the behavior by Goodyear and its counsel, the proposed order concluded sanctions were appropriate. The proposed order focused on Goodyear's failure to produce the Heat Rise tests and the repeated statements by Mr. Hancock that all responsive documents had been produced.

The proposed order first concluded the First Request seeking "all tests" remained in place and Goodyear's attempt to respond by objecting and providing a limited set of documents was inappropriate. (Doc. 970–1 at 18). Therefore, the Heat Rise tests should have been produced in response to the First Request. Next, the proposed order recounted that the Heat Rise tests also were responsive to the Third Request where Plaintiffs sought "documents which relate to any speed or endurance testing to determine that the [G159] was suitable for [65 and 75] mph highway purposes." (Doc. 970–1 at 18–19). The proposed order focused on the argument made by Goodyear that the Heat Rise tests did not qualify as "high speed testing." The Court rejected this position because Plaintiffs had never limited their request to "high speed testing." Moreover, the Heat Rise tests themselves were labeled as "highway testing," meaning they easily qualified as "high speed testing." In fact, the Court preliminarily concluded the tests were *obviously* responsive" to a request for testing to determine suitability for "highway purposes." (Doc. 970–1 at 22). The Court did not address, because Goodyear did not argue, that the Heat Rise tests were not responsive because Goodyear had not relied on them when determining the G159's suitability for highway use.

The proposed order noted that despite clear evidence that someone had behaved inappropriately, the record was not sufficiently clear to determine who was "responsible for each instance of misconduct" nor was it sufficiently clear to determine "the appropriate amount to be awarded." (Doc. 970–1 at 23). The Court directed Goodyear and its counsel to "file either joint or separate briefs" addressing the proposed order. (Doc. 970).

## XVII. Briefing After Preliminary Order

Based on the proposed order, Mr. Hancock, Mr. Musnuff, and Goodyear retained new counsel and filed separate responses. The contents of that briefing must be analyzed in some detail to show the different positions adopted by Mr. Hancock, Mr. Musnuff, and Goodyear once they realized that the Court was taking the matter seriously.

### A. Mr. Hancock's Response

Mr. Hancock's response focused on the timing of his statements to the Court and his knowledge about the Heat Rise tests. Mr. Hancock explained that he "did not see the Heat Rise test until it was ordered to be produced following Plaintiffs' Motion for Sanctions" and he was not involved in any discussions to determine whether the Heat Rise tests were responsive to a discovery request. (Doc. 980 at 3). Mr. Hancock claimed it would be inappropriate to sanction him for any of his in-court statements because, at the time he made the statements, he did not know they were false.

## B. Mr. Musnuff's Response

Mr. Musnuff's response focused on the fact that he allegedly held a good faith belief that the Heat Rise tests were not responsive to Plaintiffs' Third Request. According to Mr. Musnuff, as of early 2007 Goodyear's only outstanding discovery obligation was to respond to Plaintiffs' Third Request.[20] (Doc. 983 at 5). As allegedly understood by Mr. Musnuff, Plaintiffs' Third Request was limited to those tests which Goodyear relied upon "to determine suitability of the G159 for 65 and 75 miles per hour." (Doc. 983 at 8). Allegedly based on conversations with Goodyear employees, Mr. Musnuff came to believe that the *only* testing data Goodyear relied upon to determine suitability were the High Speed tests which were produced to Plaintiffs in June 2007.

Somewhat bizarrely, Mr. Musnuff's response also argued that the objections which accompanied the responses to Plaintiffs' Third Request were "asserted for technical reasons only, and [were] not indicative that additional responsive documents were located." (Doc. 983–1 at 8). In his letters to Mr. Kurtz before the sanctions motion was filed, Mr. Musnuff had repeatedly taken the position that the objections to the First Request *were* an indication that other documents existed. Thus, Mr. Musnuff seemed to be arguing Plaintiffs should have realized Goodyear's objections to the First and Third Requests were conveying precisely opposite positions. Mr. Musnuff provided no explanation how Plaintiffs should have arrived at this conclusion.

## C. Goodyear's Response

As with Mr. Musnuff's response, Goodyear's response focused on its position that it did not use the Heat Rise tests to determine the G159 was suitable for highway purposes. Accordingly, Goodyear argued that the Heat Rise tests were not responsive to Plaintiffs' Third Request. Goodyear made no serious attempt to explain why the Heat Rise tests were not produced based on Plaintiffs' First Request. Instead, Goodyear merely noted that it had objected to the First Request. (Doc. 984 at 4). Goodyear also argued there was no deliberate strategy to conceal the Heat Rise tests because it produced the Heat Rise tests in two other cases where the plaintiffs "sought 'heat testing' or … obtained a Court order compelling production of 'all tests.' " (Doc. 984 at 7).

Goodyear's response was supported by the declaration of Ms. Okey. According to that declaration, the Heat Rise tests were "produced in the *Woods* case in August 2007 in response to a court order requesting production of *all* tests. Moreover, the same report was produced in the *Schalmo* case in August 2008, where the plaintiffs specifically sought discovery relating to, among other things, heat testing." (Doc. 984–1 at 5). These two statements were either misleading or false.

First, there was never an order in the *Woods* case requiring the production of "*all* tests." Instead, the order required Goodyear to "produce to the Plaintiff every document requested" in the plaintiffs' Fifth Request for Production of Documents. (Doc. 992–1 at 127). That request did not contain a request for "all tests" and Ms. Okey's statement to the contrary is wrong. The decision to submit a written declaration containing such a statement—a situation where careful review and drafting is possible—shows an unfortunately casual attitude to the issues presented by Plaintiffs' motion.

---

**20.** This is misleading as Mr. Musnuff's January 11, 2007 email to Mr. Hancock admitted Goodyear might need to supplement its prior responses "to show the testing of this tire at various speeds."

And second, Ms. Okey's statement regarding the *Schalmo* case may not qualify as false but it is at least a deliberate attempt to mislead. As explained earlier, Goodyear's responses to the discovery requests in *Schalmo* specifically listed the Heat Rise tests as responsive to a request for "all documents reflecting studies, analysis or testing ... associated with determining the appropriate speed rating, Load Range and/or vehicle application of the G159 tires." (Doc. 992–1 at 4). Ms. Okey, perhaps hoping the Court would not look to the underlying documents, makes no effort to explain the situation in *Schalmo* or that the Heat Rise tests were not produced *only* in response to a request for "heat testing." Again, Ms. Okey's casual attitude to the underlying facts in *Schalmo* do not reflect well on her or Goodyear.

Finally, in making its various arguments against the proposed order, Goodyear inadvertently disclosed that there were *other* tests which it had not disclosed in this case. In its response, Goodyear attempted to explain that it gave Mr. Musnuff "the only W84 high speed test data [it] was able to locate." (Doc. 984 at 6). In a footnote, Goodyear provided further context, stating it "produced 16 different high speed test results, but 12 of those test results were performed in 2000 and relate to G 159 Series tires used by NASCAR. Moreover, Goodyear also produced several crown durability, bead durability and DOT endurance tests." (Doc. 984 at 6). In support of this latter statement, Goodyear cited to a declaration by Richard J. Olsen, the individual Goodyear had used as its 30(b)(6) witness. (Doc. 984–1 at 13).

In his declaration, Mr. Olsen tried to explain how his testimony during his deposition was accurate but, in doing so, Mr. Olsen accidentally revealed it was not. Mr. Olsen's declaration stated that during his deposition, he had been "asked if there [were] 'any separate testing' besides the tests Goodyear produced, which included DOT tests, crown durability tests, bead durability tests and high speed tests." (Doc. 984–1 at 17). During the deposition, Mr. Olsen had responded "that a number of different tests are run in the development process but they could not be found." (Doc. 984–1 at 17). Because Mr. Olsen apparently believed that Goodyear had disclosed "crown durability tests, bead durability tests and high speed tests," his deposition testimony that no other testing existed was, in his mind, accurate. Mr. Olsen's declaration stated he stood by that deposition testimony. (Doc. 984–1 at 17). Unfortunately for Mr. Olsen, his deposition and declaration were both false.

Four days after filing Mr. Olsen's declaration, Goodyear filed a "Notice of Correction." That notice stated "the crown durability, bead durability and DOT endurance tests were not produced in this case." (Doc. 989 at 2). The notice provided no explanation why Mr. Olsen had submitted a false declaration here or how Mr. Olsen's deposition testimony could be viewed as accurate given that other tests existed. In fact, it is no longer possible that Mr. Olsen's deposition testimony was even close to accurate.

The present record shows that Mr. Olsen knew about "the crown durability, bead durability, and DOT endurance tests" at his deposition. Those tests had not been produced to Plaintiffs. During his deposition, he was asked if there was "any separate testing that would have been done on this ... particular tire" other than that already produced by Goodyear. Mr. Olsen responded there were other tests, but he did not have them. That was false. He was then asked if the other tests were still available. He stated "I don't believe so." That was false. In short, Goodyear's 30(b)(6) witness provided false testimony but the falsity emerged only as a result of

Goodyear's inability to keep its falsehoods straight. A responsible corporation would have corrected the false deposition testimony immediately after the fact. At the very least, a responsible corporation would not compound the problem by submitting a false declaration affirming the false deposition testimony. Goodyear has not offered an explanation for Mr. Olsen's testimony or its own inexplicable behavior. The only reasonable conclusion is that Goodyear was, and continues to be, operating in bad faith.

## XVIII. Additional Briefing

Dissatisfied with Mr. Hancock, Mr. Musnuff, and Goodyear's inability to provide clear answers on certain issues, the Court directed additional briefing addressing five questions. This briefing included further evolution of certain positions.

### A. Production in *Schalmo*

The first question the Court asked was why Goodyear produced the Heat Rise tests in *Schalmo* but withheld them in *Haeger*. (Doc. 995 at 1). Goodyear and Mr. Musnuff responded that the *Schalmo* responses were prepared by Florida counsel and neither Mr. Musnuff nor anyone at Goodyear knew, in particular, why the Heat Rise tests were produced. (Doc. 1000 at 3; Doc. 1001 at 3). Mr. Hancock claimed he had not been involved in *Schalmo* and could not opine on anything that happened in that case. (Doc. 999 at 11).

Mr. Musnuff and Goodyear's inability to provide a reasonable explanation for the differences between *Schalmo* and *Haeger* is telling. Given the attempt to shift the blame to Florida counsel, it is manifestly clear the *Schalmo* disclosure was a result of Goodyear inadvertently giving the Heat Rise tests to local counsel and that counsel then producing the tests, unaware that Goodyear did not want to produce them (allegedly because they were totally irrelevant and conducted for no reason).

### B. Other Tests

The second question posed by the Court was whether the " 'crown durability, bead durability and DOT endurance test reports' should have been produced" in the present case. (Doc. 995 at 2). Mr. Musnuff responded that they "should *not* have been produced in the *Haeger* litigation" because they were not responsive to Plaintiffs' Third Request. (Doc. 1000 at 10). Goodyear also maintained that they were not responsive to Plaintiffs' Third Request. (Doc. 1001 at 4). Goodyear admitted, however, that "if Plaintiffs' First Request for Production remained operative," the tests "should have been produced." (Doc. 1001 at 5). Mr. Hancock responded that he had "no knowledge concerning these new tests, the purpose of these tests, or what these tests represent." (Doc. 999 at 12). These positions present a dizzying array of misstatements and simple falsehoods.

The positions argued by Mr. Musnuff and Goodyear cannot be reconciled with the facts. As evidenced by the proceedings in *Woods*, both Mr. Musnuff and Goodyear (through its employees), knew the Heat Rise tests, the crown durability test, the bead durability test, and the DOT endurance tests were all responsive to a request for the testing Goodyear used to determine the G159's suitability. Thus, all these tests were responsive to Plaintiffs' Third Request. Mr. Musnuff also knew these tests were responsive to Plaintiffs' First Request. Moreover, the record demonstrates that Mr. Musnuff believed the First Request remained in place and Goodyear's admission that these documents should have been produced in response to that request means Mr. Musnuff deliberately withheld these responsive documents in the "best interest[s]" of Goodyear. It is only now, after having been caught withholding the documents, that Mr. Musnuff is formulating his convoluted

argument that he withheld them because they were not responsive to the Third Request. And while Goodyear can be commended for its candor in admitting these tests are responsive, it failed to provide any explanation why its 30(b)(6) witness testified falsely at his deposition that no tests other than those already produced to Plaintiffs existed.

As for Mr. Hancock, his claim that he did not know about these additional tests is false. As shown by the email from Mr. Musnuff to Mr. Hancock in the *Bogaert* matter, Mr. Hancock *did* know about these tests and *did* know they were part of Goodyear's "whole testing package" to determine the G159 was suitable for "over-the-road" use.

### C. Heat Rise Tests Conflict with Representations

The third question posed by the Court was whether "the results of the Heat Rise tests conflict with any representation made during" the present case. In response, Mr. Hancock admirably admitted that the mere fact that the Heat Rise tests exist meant some of his statements were incorrect. (Doc. 999 at 12). Mr. Musnuff and Goodyear responded they were unable to determine whether the Heat Rise test results conflict with any representation.

Mr. Musnuff and Goodyear's responses were not good faith responses. At the time they filed their responses, Mr. Musnuff and Goodyear knew that Mr. Hancock had made various in-court statements which were later proven false. For example, Mr. Hancock had represented that Goodyear had responded to all discovery and that no other documents existed. The existence of the Heat Rise tests means that Mr. Hancock's statements were incorrect and Mr. Musnuff and Goodyear's inability to acknowledge that basic fact is disturbing.

### D. Party Responsible for Not Producing Heat Rise Tests

The fourth question was who was responsible for not producing the Heat Rise tests. Mr. Hancock responded that he could not be held responsible as he was unaware that the tests existed. Mr. Musnuff claimed he was jointly responsible with Goodyear because Goodyear had informed him that it did not use the Heat Rise tests to determine the G159's suitability for highway use. Thus, based on this information, Mr. Musnuff allegedly decided not to produce the test in response to Plaintiffs' Third Request. Goodyear argued that only Mr. Musnuff should be held responsible because it provided the Heat Rise tests to Mr. Musnuff and it relied on him "to prepare discovery responses, to identify documents responsive to discovery requests and to handle day-to-day management of the *Haeger* case." (Doc. 1001 at 8). In Goodyear's view, there was "no evidence that Goodyear itself acted in bad faith or deliberately concealed G159 Tire test results." (Doc. 1001 at 8). This latter statement is of some interest.

It is now clear that Goodyear's 30(b)(6) witness testified falsely at his deposition regarding the Heat Rise tests, the crown durability test, the bead durability test, and the DOT endurance tests. Therefore, the claim that Goodyear itself did not deliberately conceal *any* "G159 Tire test results" is not true. (Doc. 1001 at 8). In addition, Ms. Okey retained final say regarding discovery responses and she must have known that Goodyear's responses in the present case were grossly inaccurate. Goodyear's attempt to shift blame entirely onto its counsel is not supported by this record.

### E. Not Produced in *Bogaert*

The final question posed by the Court was why the Heat Rise tests were not

produced in the Arizona state case of *Bogaert v. Goodyear*. Mr. Hancock responded he informed Mr. Musnuff and Goodyear about the "affirmative disclosure obligations under the Arizona Rules of Civil Procedure" but he had no idea the Heat Rise tests even existed at the time *Bogaert* was litigated. Goodyear stated it did not know for certain if the Heat Rise tests had been produced in *Bogaert*. And Mr. Musnuff responded the Heat Rise tests were not produced because the *Bogaert* plaintiffs "sought testing used by Goodyear to determine the tire's suitability for 65 and 75 miles per hour." (Doc. 1000 at 11).

In effect, neither Mr. Musnuff nor Goodyear were able to offer *any* plausible basis for not producing the Heat Rise tests in *Bogaert*. Mr. Musnuff's explanation that he only produced tests specifically sought by the *Bogaert* plaintiffs in a discovery request shows such a fundamental misunderstanding of his disclosure obligations under Arizona law that it is surprising Mr. Musnuff would assert such a position without some further explanation. *See Norwest Bank (Minnesota), N.A. v. Symington*, 197 Ariz. 181, 3 P.3d 1101, 1105–06 (Ariz.Ct.App.2000) (explaining disclosure obligations and specifically rejecting claim that information need only be produced in response to precise discovery request). Mr. Musnuff's failure to acknowledge that the failure to disclose the Heat Rise test in *Bogaert* was improper shows he still has not grasped that his behavior was inappropriate.

Goodyear's position is equally perplexing in that it refuses to admit the obvious, *i.e.* that the Heat Rise tests should have been produced in *Bogaert*. Goodyear's failure to straightforwardly admit that its counsel committed such an obvious error gives the impression that Goodyear lacks remorse for the mistakes made on its behalf. As with its response to the false testimony by

its 30(b)(6) witness, Goodyear is not behaving responsibly.

And finally, Mr. Hancock's response was evasive in that the record now establishes Mr. Hancock knew of the Heat Rise tests (and other tests) while *Bogaert* was being litigated. There is no explanation for Mr. Hancock's willingness to aid Mr. Musnuff and Goodyear in flouting Arizona's disclosure rules.

## XIX. Evidentiary Hearing

The Court held an evidentiary hearing on March 22, 2012. At that hearing, Mr. Musnuff and Mr. Hancock testified. Mr. Musnuff's testimony conflicted with the documentary evidence and was not credible. Mr. Hancock's testimony, while more reliable than Mr. Musnuff's, still conflicted with the underlying evidence and was not entirely credible.

### A. Mr. Musnuff's Testimony

Mr. Musnuff's testimony covered a variety of topics, including his explanation for when he first received the Heat Rise tests and what he understood the Heat Rise tests to mean. Despite the written declaration by Mr. Taylor that he gave the Heat Rise tests to Mr. Musnuff in January 2007, Mr. Musnuff testified he first learned of the Heat Rise tests sometime in August 2007. (Doc. 1014 at 97). When pressed, Mr. Musnuff explained that Mr. Taylor's representations that the Heat Rise tests were located and provided to Mr. Munsuff in January 2007 was a mistake. (Doc. 1014 at 122). Moreover, according to Mr. Musnuff, the January 24, 2007 date printed on the Heat Rise tests was inaccurate and no one could figure out what it meant.

Next, Mr. Musnuff testified that he determined the Heat Rise tests were not responsive to Plaintiffs' Third Request based on statements made to him by "numerous Goodyear engineers" that the tests had "nothing to do with the durability of

the tire or its ability to function at highway speeds." (Doc. 1014 at 29). Mr. Musnuff asserted he was "repeatedly told by Goodyear that the only test determined for suitability for 65 and 75 mile an hour highway use was the W84 tests." (Doc. 1014 at 29–30). When asked to explain this in more detail, Mr. Musnuff stated:

> As was explained to me by the Goodyear engineers, the heat rise test is not a test to evaluate the tire itself. It's a compounder's test used to evaluate different compounds that might be used in different tires; or if you're trying to improve a compound or such, you might test one and then test another. You have to test them in something so you test them in a tire, but they're really evaluating the compound rather than the tire.

(Doc. 1014 at 34). The Court could not understand this statement and pressed Mr. Musnuff for a more precise explanation:

> The Court: If one compound is better than one, but the purpose [of the Heat Rise tests] is to improve the quality of the tire; right?
>
> Mr. Musnuff: I would think that all of the engineering that Goodyear does is to ultimately to try to improve the quality of the products.
>
> The Court: So, then, in essence, then, it does have something to with its endurance or durability because that is, at bottom, what is important to Goodyear; right?
>
> Mr. Musnuff: Well, no. Your Honor, if I can disagree. As it was explained to me, that this is in no way a durability test or an endurance test. . . . It's just to provide—it's like an information point only. . . .
>
> The Court: So if one of the compounds was found . . . to be better than another compound, what would the engineering group do?
>
> Mr. Musnuff: That I don't know.

* * *

> The Court: But what was [the Heat Rise test] designed to do?
>
> Mr. Musnuff: Just to provide information that a compounder could look at.
>
> The Court: Was it academic or was it for recreation? What was it for?
>
> Mr. Musnuff: No, not academic but there's no qualified—there's no standard that applies to it. . . . It's just to provide a point of information so that you can compare one compound you're testing versus another compound you're testing.

Mr. Musnuff explained that he talked to Mr. Taylor and Mr. Stroble regarding the Heat Rise tests and they informed him the tests were not responsive because Goodyear had not relied on them when determining the suitability of the G159 for highway use. (Doc. 1014 at 40).

On cross-examination, Mr. Musnuff testified that the Heat Rise tests were not even relevant to Plaintiffs' allegations. (Doc. 1014 at 45). Mr. Musnuff did concede, however, that the Heat Rise tests qualified as "wheel tests" which were requested by Plaintiffs in their First Request. Mr. Musnuff admitted Goodyear never supplemented its responses to the First Request nor did it otherwise alert Plaintiffs that tests were being withheld. (Doc. 1014 at 46, 54). Mr. Musnuff also stated he did not recall questioning why the Heat Rise tests were labeled "durability tests" if they were not, in fact, durability tests. (Doc. 1014 at 50).

Towards the end of the cross-examination, Mr. Musnuff admitted he attended the deposition of Goodyear's expert where that expert expressed the opinion that "heat in excess of 200 degrees for a prolonged period of time . . . can lead to tread separations." (Doc. 1014 at 79). Despite the fact that the Heat Rise test established the G159 "was running at 229 degrees," Mr. Musnuff maintained it was utterly ir-

relevant because the Heat Rise test had "nothing to do with measuring the durability of the tire." (Doc. 1014 at 80).

After all counsel concluded their questioning of Mr. Musnuff, the Court asked a series of questions. First, the Court asked why the Heat Rise tests were turned over in *Schalmo* but not in *Haeger*. Mr. Musnuff explained that he came to believe Mr. Kurtz had narrowed his discovery request such that the Heat Rise tests were not responsive to any outstanding request. (Doc. 1014 at 128–29). Next, the Court asked why there were no efforts to locate any testing before January 2007. Mr. Musnuff explained that there had been no case before 2003 that "required ... production of further testing beyond the compliance testing" Goodyear routinely produced. (Doc. 1014 at 131). Third, the Court confirmed Mr. Musnuff had been present for the depositions of the various experts. (Doc. 1014 at 133). Mr. Musnuff confirmed that he was present for Goodyear's expert's deposition and that the expert had stated "anything over 200 [degrees] could cause separation." (Doc. 1014 at 134). Despite the Heat Rise tests casting serious doubt on this opinion, Mr. Musnuff stated he had behaved properly because the Heat Rise tests were not responsive to any discovery request. When the Court expressed some confusion how Mr. Musnuff believed it was proper for him to allow Goodyear's expert to provide testimony directly undercut by Goodyear's own testing, Mr. Musnuff repeated that the Heat Rise tests had absolutely no practical application other than providing a "data point" to compare two compounds. (Doc. 1014 at 137). The results of the Heat Rise tests "mean[ ] nothing, essentially nothing in terms of durability on the road." (Doc. 1014 at 139).

Finally, the Court confirmed that the Heat Rise tests had been used during the *Schalmo* trial to show the G159 was defec-

tive. (Doc. 1014 at 138). Based on a question from Plaintiff's counsel, Mr. Musnuff confirmed that in *Schalmo*, Goodyear never disclosed that its expert in *Haeger* had "said the tire would foreseeably fail at [temperatures] above 200 degrees." (Doc. 1014 at 144). Based on the entire record, Mr. Musnuff's testimony was not credible.

To begin, the Court concludes Mr. Musnuff received the Heat Rise tests in January 2007. As stated by Mr. Taylor, the High Speed tests and Heat Rise tests were uncovered in the same database and, according to the date printed on all those documents, printed in January 2007. While Mr. Musnuff may not remember getting the Heat Rise tests at that time, Mr. Taylor's version of events makes more sense and is supported by the date printed on the Heat Rise tests.

Next, Mr. Musnuff's repeated position that he did not turn over the Heat Rise tests because he was told by individuals at Goodyear that they were not responsive cannot be taken seriously. The claim that the Heat Rise tests were merely to "provide information that a compounder could look at" is not reasonable. Goodyear performed the test for some purpose and Mr. Musnuff's own statements reflect this. For example, in his February 11, 2007 memo, Mr. Musnuff observed that a change in the compound of the G159 improved performance. (PSOF Ex. 12). Moreover, his June 5, 2008 email to Mr. Hancock stated Goodyear's "whole testing package" was to ensure the G159 was suitable for "over-the-road applications, including RV." (PSOF 31). And in an email dated May 8, 2009, Mr. Musnuff stated the Heat Rise tests were "taken during the *durability* testing of the G159." (PSOF Ex. 34) (emphasis added). Accordingly, prior to these sanctions proceedings, Mr. Musnuff knew the Heat Rise tests were part of Goodyear's testing used to determine the

durability and suitability of the G159 for use on the road. His testimony to the contrary during the hearing cannot be believed.

Finally, Mr. Musnuff's claim that the Heat Rise tests were not even relevant to Plaintiffs' claim is frivolous. Mr. Musnuff knew Plaintiffs' theory and knew that Plaintiffs believed high temperatures caused tire separations. Mr. Musnuff also knew that Plaintiffs' expert had stated the temperatures at which tire degradation would occur and knew the temperature Goodyear's own expert had testified about which would be cause for concern. Maintaining that the Heat Rise tests were irrelevant when they showed the temperature the G159 operated at when used at highway speeds is so obviously relevant that Mr. Musnuff's current position to the contrary is clear evidence he is operating in bad faith.

**B. Mr. Hancock's Testimony**

Mr. Hancock's testimony began with a discussion of his representation of Goodyear in the *Bogaert* case. (Doc. 1014 at 145). Mr. Hancock stated he had conversations with Mr. Musnuff regarding the requirements of Arizona Rule of Civil Procedure 26.1. (Doc. 1014 at 149). As the record now shows, Goodyear did not even attempt to locate testing data as part of its initial disclosure in *Bogaert*. Thus, either Mr. Hancock did not explain the requirements of Arizona Rule 26.1 to Mr. Musnuff and Goodyear or Mr. Musnuff and Goodyear chose to ignore that rule. Based on the entirety of the record, Mr. Hancock appears to have made no meaningful effort to ensure Goodyear was complying with the Rule.

Next, Mr. Hancock's testimony focused on his in-court statements in the present case. Mr. Hancock was adamant that at the time he made certain in-court statements, he had no prior exposure to the Heat Rise tests. At one point during cross-examination, Mr. Hancock stated: "I have never heard, before [Plaintiffs'] motion was filed in this case for sanctions, of a heat rise durability test." And at another point, "I never saw the heat rise test until it was ordered produced in this case after [Plaintiffs'] motion. I did not know the contents of the heat rise test at any time prior to its production here. I did not know it was called anything other than a heat rise test, and no one mentioned it to me ever during any of the times referenced in the Court's order." (Doc. 1014 at 168).

On the topic of the High Speed tests which were eventually produced in response to Plaintiffs' Third Request, Mr. Hancock stated he learned of their existence "sometime prior to the third Request for Production," probably in "April or May of 2007." (Doc. 1014 at 158). Mr. Hancock admitted, however, that he was unclear on the exact date. (Doc. 1014 at 158). Mr. Hancock was asked why there had been a five month delay between when Mr. Musnuff said he first learned of the high speed tests in February 2007 and when they were produced in June 2007. The response was: "I don't know the answer to that, sir, because that would have been between Goodyear and Mr. Musnuff. I know that I received the documents with clearance to produce them on June 20, 2007." (Doc. 1014 at 159).

Mr. Hancock then recounted the series of events regarding the eventual production of the High Speed tests as follows. At the April 6, 2007 hearing, Mr. Hancock was "taken aback" by the Court's question regarding outstanding discovery because "nobody had been after [him] for any discovery." (Doc. 1014 at 164). When asked whether he knew about the High Speed tests at that time, Mr. Hancock responded "I haven't reviewed my records. I don't believe so but I don't know for certain. I apologize." Then, according to his testi-

mony, sometime prior to May 17, 2007, he received Plaintiffs' Third Request. As of May 17, 2007, Mr. Hancock had sent the Third Request to Mr. Musnuff and Mr. Hancock "knew there was [high speed] testing." Mr. Hancock produced some of the high speed testing on June 6, 2007. (Doc. 1014 at 160). And produced the remaining tests on June 21, 2007. (Doc. 1014 at 159).

Finally, Mr. Hancock was asked regarding his behavior in connection with the deposition of Plaintiffs' expert Mr. Osborne. That deposition occurred on May 24, 2007. (Doc. 1014 at 164). At the time, Mr. Hancock knew Mr. Osborne "was under the impression that there was no high-speed testing at all." (Doc. 1014 at 166). When asked whether he told Plaintiffs prior to Mr. Osborne's deposition "that Goodyear had located those high-speed tests," Mr. Hancock admitted he did not. (Doc. 1014 at 167). Overall, Mr. Hancock was more credible than Mr. Musnuff but Mr. Hancock's testimony also established certain instances of inappropriate behavior.

It is now clear beyond dispute that Mr. Hancock knew in February 2007 that Goodyear had located the High Speed tests. Therefore, at the time of the April 6, 2007 hearing, Mr. Hancock had known about the high speed tests for two months and he had even acknowledged in an email to Mr. Musnuff that the tests should be produced. His statements at that hearing that Goodyear had "responded to all discovery" and Goodyear was "done or nearly done" were false.

Next, as of February 2007 Mr. Hancock knew Goodyear had the High Speed tests and, as acknowledged in his own email, those tests were important in response to Plaintiffs' expert's report. Long before that expert's deposition, Mr. Hancock knew Plaintiffs and the expert had been materially misled regarding the scope of Goodyear's testing. Despite this knowledge, Mr. Hancock proceeded with the deposition of Mr. Osborne and only produced the High Speed tests after the deposition was complete. At best, this behavior was aimed at prolonging the litigation. At worst, this behavior was meant to prevent Plaintiffs from obtaining information which would help their case until it was too late for them to do anything with it.

And finally, Mr. Hancock's testimony that he had "never heard ... of a heat rise durability test" before the present sanctions proceedings was false. As evidenced by the emails from *Bogaert*, Mr. Hancock was informed in 2008 that Goodyear had produced "heat-rise test data" in another G159 case. It is possible Mr. Hancock merely forgot about the *Bogaert* emails but, in the context of this case, it appears more likely that Mr. Hancock was not expecting Plaintiffs to gain access to the *Bogaert* emails and his testimony was an attempt to paint himself in a sympathetic light.

## ANALYSIS

What above all else is eroding public confidence in the Nation's judicial system is the perception that litigation is just a game, that the party with the most resourceful lawyer can play it to win, that our seemingly interminable legal proceedings are wonderfully self-perpetuating but incapable of delivering real-world justice.

*Caperton v. A.T. Massey Coal Co., Inc.*, 556 U.S. 868, 129 S.Ct. 2252, 2274, 173 L.Ed.2d 1208 (2009) (Scalia, J., dissenting).

Mr. Hancock, Mr. Musnuff, and Goodyear engaged in repeated and deliberate attempts to frustrate the resolution of this case on the merits. From the very beginning, Mr. Hancock, Mr. Musnuff, and Goodyear adopted a plan of making discovery as difficult as possible, providing only those documents they wished to provide, timing the production of the small subset

of documents they were willing to turn over such that it was inordinately difficult for Plaintiffs to manage their case, and making false statements to the Court in an attempt to hide their behavior. In the end, that plan succeeded in making this case far more complicated than necessary, requiring an absurd expenditure of resources by Plaintiffs and the Court.[21] Goodyear also succeeded in obtaining a settlement from Plaintiffs, a settlement Plaintiffs now believe was less than they would have been able to achieve had Mr. Hancock, Mr. Musnuff, and Goodyear complied with their discovery obligations.

The necessity for sanctions in these circumstances is obvious. But the form those sanctions should take presents a very difficult question. As set out below, the Ninth Circuit case law does not provide clear guidance for remedying a years-long course of misconduct such as that presented here. If the misconduct had come to light while the case was ongoing, entry of default judgment with a trial on damages would have been the obvious solution. *Hester v. Vision Airlines, Inc.*, 687 F.3d 1162 (9th Cir.2012) (affirming striking of answer and entry of default judgment because of discovery misconduct). But this case is closed and the issue is the permissible scope of sanctions in this context. The Ninth Circuit seems to allow an award of sanctions only in the amount of harm directly caused by the sanctionable conduct. In the present circumstances, it would be impossible to draw the precise causal connections between the misconduct and the fees Plaintiffs incurred. Neither the Court nor the Plaintiffs could separate the fees incurred due to legitimate activity from the fees and costs incurred due to Goodyear's refusal to abide by clear and simple discovery obligations. For example, if Goodyear had responded to Plaintiffs' First Request with all responsive documents, Goodyear might have decided to settle the case immediately.[22] In these circumstances, one could conclude practically all of Plaintiffs' fees and costs were due to misconduct (*i.e.*, the case would have been resolved in an easy and straightforward manner absent Goodyear's obstructionism). Alternatively, one could conclude practically none of Plaintiffs' fees and costs were due to misconduct (*i.e.*, even if Goodyear had disclosed every responsive document in its possession, Goodyear could have refused to settle and prolonged the litigation through other tactics).

While there is some uncertainty how the litigation would have proceeded if Goodyear and its attorneys were acting in good faith, based on Goodyear's pattern and practice in G159 cases, the case more likely than not would have settled much earlier. In these circumstances, the most appropriate sanction is to award Plaintiffs *all* of the attorneys' fees and costs they incurred after Goodyear served its supplemental responses to Plaintiffs' First Request.[23] That was the first definitive proof

---

**21.** Prior to these sanctions proceedings, the parties filed approximately 163 motions, the Court issued 254 orders, and the case had close to 1,000 docket entries. By way of comparison, a patent case filed around the same time, and which included a twelve-day jury trial, ended with approximately 700 docket entries. *Dupont Air Products Nanomaterials, LLC v. Cabot Microelectronics Corp.*, CV–06–2952. And an incredibly complex ERISA class action, filed a year earlier than the present case, ended this year with just over 750 docket entries. *Allen v. Honeywell*, CV–04–424.

**22.** Of course, the evidence might have made Plaintiffs realize they had a winning trial and they would have refused to settle.

**23.** The Court recognizes that Plaintiffs might have a contingency agreement with their counsel. The amount of sanctions will be calculated pursuant to the lodestar method and will not be limited to the amount paid by Plaintiffs as a percentage of the settlement.

that Goodyear was not going to cooperate in the litigation process. Instead, Goodyear believed discovery would consist of a "game of hide and seek." *Dreith v. Nu Image, Inc.*, 648 F.3d 779, 790 (9th Cir. 2011); *Holmgren v. State Farm Mutual Auto. Ins. Co.*, 976 F.2d 573, 579 (9th Cir.1992) (faulting party for "treating discovery as a game instead of a serious matter); *United States v. $42,500*, 283 F.3d 977, 983 (9th Cir.2002) ("A court is not a place to play hide-and-go-seek with relevant evidence and information."). Goodyear and its counsel must now pay the price for adopting this approach.

As permitted by Arizona law, Plaintiffs may wish to affirm their settlement agreement and pursue an independent cause of action for fraud based on Mr. Hancock, Mr. Musnuff, and Goodyear's behavior. But the present case has long been closed and it would be inappropriate to allow Plaintiffs to litigate their fraud claims here. *Cf. Appling v. State Farm Mut. Auto. Ins. Co.*, 340 F.3d 769, 780 (9th Cir.2003) (allowing judgment to be set aside only upon showing of "grave miscarriage of justice").

## I. Standard for Awarding Sanctions

Given that this case was closed pursuant to the parties' agreement, there are two possible bases for imposition of sanctions against Mr. Hancock, Mr. Musnuff, and Goodyear: 28 U.S.C. § 1927 and the Court's inherent power.[24] As set out below, sanctions are appropriate under both.

### A. 28 U.S.C. § 1927 Cannot Reach Goodyear's Conduct

■■■ Pursuant to 28 U.S.C. § 1927: "Any attorney … who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct." Under this statute, an attorney's conduct is sanctionable only if it multiplies the proceedings in both an "unreasonable and vexatious manner." *B.K.B. v. Maui Police Dep't*, 276 F.3d 1091, 1107 (9th Cir.2002). In addition, an attorney must have acted in bad faith or engaged in conduct tantamount to bad faith. *Pacific Harbor Capital, Inc. v. Carnival Air Lines, Inc.*, 210 F.3d 1112, 1118 (9th Cir.2000) ("The imposition of sanctions under § 1927 requires a finding of bad faith."). But this statute allows for sanctions *only* against "an attorney or otherwise admitted representative of a party." *F.T.C. v. Alaska Land Leasing, Inc.*, 799 F.2d 507, 510 (9th Cir.1986). Therefore, any sanctionable conduct by Goodyear itself is beyond the reach of § 1927.

### B. Court's Inherent Power Reaches Goodyear and Counsel

■■■ "Under its inherent powers, a district court may … award sanctions in the form of attorneys' fees against *a party or counsel* who acts in bad faith, vexatiously, wantonly, or for oppressive reasons." *Leon v. IDX Sys. Corp.*, 464 F.3d 951, 961 (9th Cir.2006) (emphasis added). But "[b]ecause of their very potency, inherent powers must be exercised with restraint and discretion." *Chambers v. NASCO, Inc.*, 501 U.S. 32, 44, 111 S.Ct. 2123, 115 L.Ed.2d 27 (1991). Thus, as with sanctions under Section 1927, before awarding sanctions under its inherent power, the

---

*Cf. Van Gerwen v. Guarantee Mut. Life Co.*, 214 F.3d 1041, 1048 (9th Cir.2000) ("A district court may not rely on a contingency agreement to increase or decrease what it determines to be a reasonable attorney's fee.").

24. Sanctions pursuant to Federal Rule of Civil Procedure 11 should be imposed before the case is closed. *See* Moore's Federal Practice § 11.22(2)(a) ("[T]he court should ordinarily impose [Rule 11] sanctions before issuing a final order.").

Court "must make an express finding that the sanctioned party's behavior constituted or was tantamount to bad faith." *Id.*

## C. Definition of Bad Faith

A comprehensive definition of "bad faith" or conduct "tantamount to bad faith" is not possible, but the type of conduct at issue "includes a broad range of willful improper conduct." *Fink v. Gomez,* 239 F.3d 989, 992 (9th Cir.2001). Such conduct includes "delaying or disrupting the litigation or hampering enforcement of a court order." *Primus Auto. Fin. Servs., Inc. v. Batarse,* 115 F.3d 644, 648 (9th Cir.1997). In addition, "willful disobedience of a court's order," actions constituting a "fraud" upon the court, or actions that defile the "very temple of justice" are sufficient to support a bad faith finding. *Chambers v. NASCO, Inc.,* 501 U.S. 32, 47, 111 S.Ct. 2123, 115 L.Ed.2d 27 (1991). And "recklessness when combined with an additional factor such as frivolousness, harassment, or an improper purpose" is sufficient. *Fink,* 239 F.3d at 994. Therefore, "reckless misstatements of law and fact, when coupled with an improper purpose" can establish bad faith. *Id.; see also B.K.B. v. Maui Police Dept.,* 276 F.3d 1091, 1108 (9th Cir.2002) (same); *Malhiot v. S. Cal. Retail Clerks Union,* 735 F.2d 1133, 1138 (9th Cir.1984) (knowing false statements of fact or law establish bad faith). It is of particular importance to note that it is "permissible to infer bad faith from [a party's] action[s] plus the surrounding circumstances." *Miller v. City of Los Angeles,* 661 F.3d 1024, 1029 (9th Cir.2011). Accordingly, Mr. Hancock, Mr. Musnuff, and Goodyear are incorrect when they repeatedly claim the Court must, in effect, obtain a confession before imposing sanctions.

## II. Type of Sanctions

Sanctionable conduct may result in both monetary and non-monetary relief.

## A. Sanctions Under § 1927

Sanctions pursuant to § 1927 are limited to an amount equal to the additional expenditures incurred "as a result of the multiplicity of the proceedings." *New Alaska Development Corp. v. Guetschow,* 869 F.2d 1298, 1306 (9th Cir.1989). Any amount awarded pursuant to § 1927 must have been directly caused by the sanctionable conduct. *United States v. Blodgett,* 709 F.2d 608, 610–11 (9th Cir.1983) ("Section 1927 only authorizes the taxing of excess costs arising from an attorney's unreasonable and vexatious conduct; it does not authorize imposition of sanctions in excess of costs reasonably incurred because of such conduct."). But this rule is softened by the recognition that it is often "impossible to determine with mathematical precision the fees and costs generated only by" the sanctionable conduct. *Lahiri v. Universal Music and Video Distribution Corp.,* 606 F.3d 1216, 1222 (9th Cir. 2010). District courts are permitted to exercise their discretion and make reasonable adjustments when attempting to determine the appropriate size of sanctions. *Id.* (affirming "reasoned exercise of discretion" regarding amount of fees awarded pursuant to § 1927).

## B. Monetary Sanctions Under Court's Inherent Power

The Ninth Circuit recently ruled that compensatory sanctions under a Court's inherent power must be limited to the amount necessary to compensate the opposing party for the harm caused by the misconduct. *Miller,* 661 F.3d at 1029. In so ruling, the Ninth Circuit concluded a district court erred by awarding all of the attorneys' fees and costs to a plaintiff when the court did not make an explicit finding that the defendant's conduct caused plaintiff to incur all of those fees.

*Id.* This holding seems to be in direct conflict with Supreme Court authority.

In *Chambers v. NASCO, Inc.,* 501 U.S. 32, 111 S.Ct. 2123, 115 L.Ed.2d 27 (1991), the district court had relied on its inherent power and sanctioned NASCO a sum equal to "the entire amount of NASCO's litigation costs paid to its attorneys." *Id.* at 40, 111 S.Ct. 2123. At the Supreme Court, Chambers challenged this amount by arguing "the fact that the entire amount of fees was awarded means that the District Court failed to tailor the sanction to the particular wrong." *Id.* at 57, 111 S.Ct. 2123. The Supreme Court rejected this argument, finding "the frequency and severity of Chambers' abuses of the judicial system" meant "[i]t was within the court's discretion to vindicate itself and compensate NASCO by requiring Chambers to pay for all attorney's fees." *Id.* at 57, 111 S.Ct. 2123. This is a rejection of the position that only monetary harms incurred as a direct result of sanctionable conduct can be remedied.

■ It is difficult to reconcile *Chambers* with the Ninth Circuit's recent *Miller* decision. *See Miller,* 661 F.3d at 1039 (Ikuta, J., dissenting) (noting *Chambers* is contrary to holding in *Miller*). In an attempt to do so, the Court concludes monetary sanctions under the Court's inherent power *usually* must be premised on a specific factual finding of a direct causal link between the sanctionable conduct and the alleged harm. Only when the sanctionable conduct rises to a truly egregious level can all of the attorneys' fees incurred in the case be awarded. *Chambers,* 501 U.S. at 57, 111 S.Ct. 2123. In less egregious cases, a court must tailor its award more carefully. *See, e.g., Lasar v. Ford Motor Co.,* 399 F.3d 1101, 1111 (9th Cir. 2005) (affirming award of sanctions "designed to compensate [plaintiff] for unnecessary costs and attorney's fees"). Of course, there is no requirement that a court limit its sanctions award to the amount of attorneys' fees and costs because sanctions can be awarded for other types of harm incurred as a result of the sanctionable conduct. For example, sanctions can compensate a party for the "pain and suffering" caused by the sanctionable conduct. *See B.K.B. v. Maui Police Dept.,* 276 F.3d 1091, 1109 (9th Cir.2002) (affirming award of "compensatory damages" sanctions pursuant to court's inherent power due to "the embarrassment and pain suffered by Plaintiff" as a result of the sanctionable conduct).

■ Finally, under its inherent power the Court may award non-compensatory monetary sanctions "to vindicate the court's authority and deter future misconduct." *Miller,* 661 F.3d at 1030. But large non-compensatory monetary sanctions "are akin to criminal contempt and may be imposed only by following the procedures applicable to criminal cases, including appointment of an independent prosecutor, proof beyond a reasonable doubt and a jury trial." *Id.*

### C. Non–Monetary Sanctions

■ In addition to monetary sanctions, courts imposing sanctions under their inherent power have a wide variety of other sanctions at their disposal. Courts have the inherent power to: vacate judgments, order dismissal of a suit, strike an answer and enter default judgment. *Chambers,* 501 U.S. at 45, 111 S.Ct. 2123; *Thompson v. Housing Authority of City of Los Angeles,* 782 F.2d 829, 831 (9th Cir.1986) (inherent power includes power to "impose sanctions including, where appropriate, default or dismissal"); *Anheuser–Busch, Inc. v. Natural Beverage Distributors,* 69 F.3d 337, 348 (9th Cir.1995) (dismissal pursuant to inherent powers); *Hester v. Vision Airlines, Inc.,* 687 F.3d 1162 (9th Cir.2012) (affirming order striking answer and en-

tering default judgment). But these type of sanctions are usually employed to vacate a fraudulently obtained judgment or where the litigation is ongoing. These sanctions are not a good fit for situations, such as the present one, where Plaintiffs have released their underlying claims and they do not wish to rescind that agreement. Because of that release, there are no pending claims which the Court could, for example, enter default judgment on.

### III. Sanctionable Behavior

The troubling behavior by Goodyear and its counsel began almost immediately after the case was filed and continued throughout the entire litigation, including post-dismissal. Without recounting the entire factual history already outlined, the following are the most egregious instances where Mr. Hancock, Mr. Musnuff, and Goodyear engaged in sanctionable behavior.

### A. First Request for Production of Documents

■■■ One of the core arguments presented by Mr. Musnuff and Goodyear is that they had no further obligation to respond to Plaintiffs' First Request after they sent their objections and a small subset of responsive documents. This position is necessitated by the fact that there can be no serious dispute that the Heat Rise tests, the extended DOT tests, the crown durability test, and the bead durability test were all responsive to the First Request. Mr. Musnuff and Goodyear have no choice but to claim the response to the First Request was appropriate. Mr. Musnuff and Goodyear also have to maintain that the First Request was withdrawn by Mr. Kurtz. Their arguments are not convincing and, in fact, it is now clear they did not adopt this position until they were faced with sanctions.

Pursuant to Federal Rule of Civil Procedure 34, Plaintiffs served their First Request shortly after the case began. (Doc. 59). That request sought "All test records for the G159 tires, including, but no (sic) limited to, road tests, wheel tests, high speed testing, and durability testing." When responding to this request, Goodyear had two options. First, Goodyear could serve an objection to the request as a whole. Fed.R.Civ.P. 34(b)(2)(B). Second, Goodyear could serve an "objection to part of [the] request" *provided* it specified the part it was objecting to and it responded to the non-objectionable portions. Fed.R.Civ.P. 34(b)(2)(C). What Goodyear could not do, but what it did, was combine its objections with a partial response, without any indication that the response was, in fact, partial.[25] Goodyear apparently believes that its response to the First Request was sufficient to signal to Plaintiffs that other potentially responsive material was not being produced. This position finds absolutely no support in the Federal Rules, federal case law, or common sense.

The language of Rule 34 is clear. The rule states: "An objection to part of a request must specify the part and permit inspection of the rest." Fed.R.Civ.P. 34(b)(2)(C). As clarified in the 1993 Advisory Committee notes, this language is meant to "make clear that, if a request for production is objectionable only in part, production should be afforded with respect to the unobjectionable portions." The natural corollary of this is that any objection must identify the particular portion which is not being responded to on the basis of the objection. As stated in Moore's Federal Practice, "If the party objects to the production of an item or category in part rather than in its entirety, *the objection must specify the part to which the objec-*

<hr/>

**25.** It is especially troubling that Goodyear claimed its secretly partial response was be-

ing made "in a good faith spirit of cooperation."

*tion pertains."* Moore's Federal Practice § 34.13(2)(b) (emphasis added). And in Federal Practice and Procedure: "The responding party may object to some or all of the discovery sought. In this case it must state, with respect to each item or category to which objection is made, the reason for the objections. *One who objects to part of an item or category should specify to which the objection is directed."* Federal Practice and Procedure § 2213 (emphasis added). The plain language of Rule 34 requires a partial response be identified as such.

This plain language analysis is supported by case law. For example, in *Rodriguez v. Simmons,* 2011 WL 1322003, at *7 (E.D.Cal.), the plaintiff had served a Rule 34 request for medical records. The defendants served objections and indicated they had already produced some responsive documents. The court observed this response was inadequate. In the court's view, the defendants had to "clearly state that responsive documents do not exist, have already been produced, or exist *but* are being withheld" based on an objection. *Id.* It was especially critical if the documents existed but were being withheld that plaintiff "be made aware of this fact." *Id.* at *7 n. 9. This would allow the parties to confer and attempt to resolve whether the unproduced documents should be produced prior to any court involvement.

Similarly, in *Pro Fit Mgmt., Inc. v. Lady of Am. Franchise Corp.,* 2011 WL 939226, at *9 (D.Kan.), a defendant had produced documents "subject to" certain objections. The plaintiff believed this response was inappropriate because it was left "wondering whether all documents [had] been produced, or if some documents [were] still being withheld." *Id.* at *8. The court agreed the response was insufficient. The court observed the defendant could "object to part of a document request," but production "subject to" general objections

was not permitted because such objections failed "to specify exactly what part of the document requests [was] being objected to." The failure to comply with Rule 34 left the plaintiff "guessing as to whether Defendant has produced all documents, or only produced some documents and withheld others." *See also GMAC Real Estate, LLC v. Joseph Carl Sec., Inc.,* 2010 WL 432318, at *1 (D.Ariz.) ("Objections must be in writing and identify the particular portions of the request subject to the objection; all other portions should be made available for inspection.").

Plain common sense also supports this reading of Rule 34. Were Goodyear correct that Rule 34 allows litigants to make undisclosed partial document productions, discovery would break down in practically every case. A litigant with *any* viable objection to a discovery request would make that objection and then produce whatever portion of otherwise responsive documents it wished to produce. Under this approach, a party would have no obligation to indicate that its production was partial and the opposing party would have no way of knowing the production was partial. Absent an indication of what, exactly, the responding party was objecting to, courts would have no way of assessing the propriety of the objections. Instead, courts would be flooded with motions to compel by litigants seeking to confirm that undisclosed responsive documents did not exist. And courts would then be forced to ask counsel, over and over again, "Do other documents exist?"

Accordingly, the plain language of Rule 34, case law, and common sense show Goodyear's response to the First Request was not complete or accurate. But Goodyear has other problems regarding the First Request in that the facts show its limited response was not made in good faith and Mr. Hancock, Mr. Musnuff, and

Goodyear knew the responses were inadequate.

As is now clear, the Heat Rise tests, extended DOT tests, crown durability test, and bead durability test were performed on the *exact* tire at issue, were *directly* relevant to Plaintiffs' defect theory, and were performed around the *same time* other tests, which were produced, were performed. Goodyear claims that its boilerplate objections in response to the First Request were appropriate, but it is clear no one made even a casual attempt to determine what responsive documents existed. There has been no acceptable explanation for Goodyear's belief that these tests were irrelevant or why Goodyear claimed that locating these tests would have been unduly burdensome. Thus, despite knowing the precise defect theory and issues presented in the case, Mr. Musnuff and Goodyear decided to make no effort to provide responsive documents. That decision is evidence that Mr. Musnuff and Goodyear were not operating in good faith.

The record also establishes that Mr. Hancock and Mr. Musnuff knew Mr. Kurtz had not withdrawn his First Request. In fact, there is indisputable evidence that Mr. Hancock and Mr. Musnuff knew the First Request remained outstanding and supplementation was needed. Mr. Hancock and Mr. Musnuff's failure to produce the High Speed tests in a timely manner was a tactical decision made in bad faith in an attempt to prolong this litigation and multiply the proceedings. Mr. Hancock and Mr. Musnuff's decision not to produce the other tests, allegedly learned of in the context of other cases, was a bad faith attempt to hide responsive documents. Goodyear is equally responsible for this behavior because despite giving documents to Mr. Musnuff, Ms. Okey retained final approval authority on discovery responses. Therefore, Ms. Okey knew Goodyear was not cooperating in discovery and was engaging in bad faith behavior.

## B. Third Request for Production of Documents

■ The response by Goodyear and its counsel to the Third Request is further proof of bad faith conduct. Plaintiffs' Third Request sought: "All documents which relate to any speed or endurance testing to determine that the subject tire was suitable for [65 and 75] mph highway purposes." (Doc. 938-1 at 17). In response to this request, Mr. Hancock, Mr. Musnuff, and Goodyear eventually produced the High Speed tests. Waiting until a response to the Third Request was due was a bad faith attempt by Mr. Hancock, Mr. Musnuff, and Goodyear to prolong the litigation and make Plaintiffs incur additional costs. In particular, Mr. Hancock and Mr. Musnuff engaged in bad faith behavior by proceeding with Plaintiffs' expert's deposition before disclosing the High Speed tests.

In addition, Mr. Musnuff and Goodyear engaged in a bad faith attempt to conceal documents when they did not produce the Heat Rise tests or the other concealed tests in response to the Third Request. Mr. Musnuff and Goodyear had previously taken the position in other litigation that these tests were responsive to an almost identical discovery request. That is, the Heat Rise tests and other concealed tests were used by Goodyear to determine the G159's suitability for use on the highway. In fact, there is correspondence reflecting Mr. Musnuff and Goodyear employees knew the Heat Rise tests and other tests were responsive to the Third Request. (PSOF Ex. 24). There is no acceptable justification for the failure to provide all responsive documents to the Third Request.

Finally, even accepting Mr. Hancock did not learn about the Heat Rise tests and

other tests until the June 5, 2008 email in *Bogaert*, Mr. Hancock's failure to immediately correct his statements and the disclosures in the present case were motivated by a bad faith desire to keep the tests concealed.

## C. Goodyear's 30(b)(6) Witness

 In September 2007, Plaintiffs deposed Richard Olsen as Goodyear's 30(b)(6) witness. Prior to this deposition, the Court confirmed with Goodyear's counsel that Mr. Olsen would be speaking on behalf of Goodyear. (Doc. 243 at 29). During his deposition, Mr. Olsen was asked if there was "any separate testing" besides the tests Goodyear had produced. Mr. Olsen responded there were a "number of different test procedures" run during the development process but no documentation of those other tests was available. That was false.

The record is clear that Mr. Olsen knew about the Heat Rise tests as well as the crown durability test, bead durability test, and DOT endurance tests at the time of his deposition. The record is also clear that those tests still existed. Mr. Olsen made clear false representations when he stated otherwise. Because he was speaking on behalf of Goodyear, that means Goodyear made false representations. Fed.R.Civ.P. 30(b)(6) (corporation must designate person "to testify on its behalf"). Mr. Olsen had an obligation to "review all corporate documentation" that was relevant to the deposition topics and it appears he did so as the summary in his files

contains references to all the concealed tests. *Calzaturficio S.C.A.R.P.A. s.p.a. v. Fabiano Shoe Co., Inc.*, 201 F.R.D. 33, 37 (D.Mass.2001). His deposition testimony, therefore, can only be explained as *consistent misrepresentations* about the available testing. This easily qualifies as conduct tantamount to bad faith.[26]

## D. Misleading In–Court Statements

 Plaintiffs first requested Goodyear's testing data in September 2006. Goodyear, through its counsel, decided not to comply with its obligation to produce some of that testing data until June 2007. And it decided to withhold completely a wide variety of testing data. Therefore, any statement prior to June 2007 that Goodyear had produced all requested documents was false. On April 6, 2007, the Court asked whether Goodyear had "any internal documentation" that had been requested but not produced. Mr. Hancock responded that it had produced all the requested documents. (Doc. 146 at 13). That was false. On May 17, 2007, the Court asked Goodyear "are there any tests that are available to show when this tire was tested for speeds above 30 miles an hour?"[27] Mr. Hancock responded that there were, but they had only been requested "last week." That was false.[28] Mr. Hancock also stated the tests would be produced in mid-June. Given the apparent plan to never produce the Heat Rise tests, this statement was misleading at best.

---

**26.** The Court recognizes that testimony by a 30(b)(6) witness may not absolutely bind "a corporate party to its designee's recollection." *See A.I. Credit Corp. v. Legion Ins. Co.*, 265 F.3d 630, 637 (7th Cir.2001) (finding 30(b)(6) testimony does not act as binding judicial admission). But Goodyear has not claimed Mr. Olsen simply made a mistake or was not aware of the other tests. Moreover, excusing this type of behavior based on its witness's faulty recollection would reward Goodyear

for not adequately preparing that witness to discuss the very material topics identified in the deposition notice.

**27.** The Heat Rise tests were conducted at 35 mph, meaning they were directly implicated by the Court's question.

**28.** The tests had been requested in September 2006.

After Goodyear produced the High Speed tests, it continued to make untruthful statements to the Court. For example, on September 10, 2007, Mr. Hancock stated Goodyear had "produced all the high speed test data on this tire in its possession in a timely response to Plaintiff's Third Request for Production." (Doc. 319 at 5). That was false. At a hearing on October 19, 2007, Mr. Hancock stated Goodyear had "searched for and produced all of the high-speed testing in its possession concerning the tire that is at issue in this case." (Doc. 361 at 45). That was false. At that same hearing, Mr. Hancock also stated there were "no documents for [its 30(b)(6) witness] to be questioned about other than the documents that have been produced." That was false. And finally, Mr. Hancock stated Goodyear had "searched for and produced all of the high-speed testing on this tire. The original discovery request [was for] all documents which relate to any speed testing to determine that the tire was suitable for highway purposes. All of that has been produced." That was false.

Mr. Hancock now claims that he did not know these statements were false at the time they were made. For some of them, he is correct. But it should go without saying that *someone* must be responsible when an attorney makes these type of repeated false statements in Court. Mr. Hancock, Mr. Musnuff, and Goodyear seem to believe sanctions are inappropriate if there is a claim, however implausible, that the false statements can be attributed to communication breakdowns. That cannot be the case. The question is, who should be responsible?

It appears Mr. Hancock did not know of the Heat Rise tests, extended DOT test, bead durability test, and crown durability test until June 2008 when he learned of them in the context of the *Bogaert* case.[29]

(PSOF Ex. 31). Therefore, the Court is sympathetic to his position that he should not be held responsible for certain statements he made after Mr. Musnuff and Goodyear knew about those tests and had made the decision not to disclose them. The problem is that Mr. Hancock did not correct the record when he subsequently learned these other tests existed. The *Haeger* case continued for approximately twenty-two months after he learned of these other tests. Accordingly, while his culpability is reduced, it is not purged.

As for Mr. Musnuff, he claims he was unaware of the in-court representations Mr. Hancock was making. That is not true. Mr. Hancock averred he "discussed any and all court appearances and discovery disputes with [Mr. Musnuff] both before and after such events." (Doc. 980–2 at 3). The Court finds this portion of Mr. Hancock's credible. Based on accepting that testimony, Mr. Musnuff was informed that Mr. Hancock was repeatedly representing in court that no further documents existed. Mr. Musnuff knew that other documents existed but he never corrected Mr. Hancock. That failure was a bad faith attempt to suppress the documents.

And as for Goodyear, its outside counsel and in-house counsel were, acting together, making materially false and misleading statements in court and withholding documents they knew to be responsive to discovery requests. Allowing Goodyear to escape the consequences of the statements made by its "freely selected agent[s] . . . would be wholly inconsistent with our system of representative litigation, in which each party is deemed bound by the acts of his lawyer-agent[s] and considered to have notice of all facts." *Link v. Wabash R.R.*, 370 U.S. 626, 633–34, 82 S.Ct. 1386, 8 L.Ed.2d 734 (1962). Ms. Okey remained responsible for discovery responses and,

---

29. Mr. Hancock knew of the High Speed tests long before they were produced.

ultimately, she remained responsible to keep informed regarding the conduct of this litigation and the representations Mr. Hancock was making in court.

## IV. Amount and Apportionment of Sanctions

Plaintiffs will be directed to file documentation establishing the amount of attorneys' fees and costs incurred after Goodyear served its supplemental responses to Plaintiffs' First Request. Based on his relatively limited involvement, but in light of his repeated misstatements and his failure to correct the record once he learned his representations were false, Mr. Hancock will be held responsible for twenty percent of those fees and costs. Mr. Musnuff and Goodyear will be held jointly responsible for eighty percent of the fees. The Court makes this allocation decision based on its belief that Mr. Hancock is less culpable but Mr. Musnuff and Goodyear are equally culpable.

This allocation decision is, of necessity, somewhat imprecise. Goodyear and its attorneys adopted a strategy, implemented in this case to great effect, to resist all legitimate discovery, withhold *obviously* responsive documents, allow Plaintiffs and their experts to operate under erroneous facts, disclose small subsets of documents as late as possible, and otherwise attempt to turn this case based on a motor vehicle accident into an Arizona version of *Jarnydce and Jarndyce*. *Cf. United States v. Washington*, 573 F.3d 701, 709 (9th Cir. 2009) (citing Charles Dickens, *Bleak House* 3 (1853)). As observed earlier, it would be impossible to point to precise causal links between all the sanctionable behavior and the expenses incurred by Plaintiffs. In a case of repeated egregious conduct such as the present, the Court must be free to fashion an appropriate remedy. The Court has done so.

Goodyear will also be required to file a copy of this Order in any G159 case initiated after the date of this Order.[30] Based on Goodyear's history of engaging in serious discovery misconduct in every G159 case brought to this Court's attention, filing this Order in future G159 cases will alert plaintiffs and the courts that Goodyear has, in the past, not operated in good faith when litigating such cases. It will also serve as notice of the existence of certain tests Goodyear attempted to conceal in previous cases.

## V. Spartan's Request for Sanctions

■ The final issue is whether to award sanctions against Mr. Hancock, Mr. Musnuff, and Goodyear in favor of Spartan. Over the years, Spartan was involved as a co-defendant in numerous G159 cases. Spartan believes the G159 test data recently revealed by Goodyear establishes "the tire would be indefensible in any action." (Doc. 1071 at 3). In particular, Spartan points to Goodyear representations that the G159 was appropriate for motor home use despite Goodyear's knowledge that the G159 operated at too high of temperature in that setting. (Doc. 1048 at 5). Based on Goodyear's misrepresentations, Spartan seeks to recover *all* the attorneys' fees and expenses it incurred as a result of G159 litigation it was involved in with Goodyear. It would be inappropriate to sanction Mr. Hancock, Mr. Musnuff, and Goodyear for actions taken in other cases. Therefore, the only issue is whether Spartan should recover any expenses incurred in the present case.

Spartan did not serve any discovery in this case. Spartan did receive copies of the discovery papers provided by Plaintiffs and Goodyear, but Spartan has not pointed to *specific* evidence establishing when and how it relied on those discovery papers in

---

30. Goodyear may apply to the court hearing the case to be excused from this requirement.

formulating its actions in this case. Absent some evidence of a causal connection between misconduct and Spartan's defense, Spartan is not entitled to an award of fees in this case. Spartan likely would have a viable case of fraud against Goodyear based on Goodyear's misrepresentations, but that claim should be litigated in as separate action where Spartan can introduce evidence regarding all the G159 litigation it was involved in over the years.

Accordingly,

**IT IS ORDERED** the Motion for Sanctions (Doc. 938) is **GRANTED IN PART.**

**IT IS FURTHER ORDERED** the Motion for Hearing (Doc. 1034) is **DENIED.**

**IT IS FURTHER ORDERED** no later than December 14, 2012 Plaintiffs shall file their application for attorneys' fees as required by Local Rule.